**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA;** ) | **CIVIL ACTION No. 13-cv-1463** |
| **[UNDER SEAL],** ) | |
| ) | **[UNDER SEAL]** |
| **PLAINTIFF,** ) | |
| ) | **FIRST AMENDED COMPLAINT** |
| ***v.*** ) | |
| ) | **FILED UNDER SEAL** |
| **[UNDER SEAL],** ) | **PURSUANT TO** |
| **DEFENDANTS.** ) | **31 U.S.C. § 3730(b)(2)** |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br>***ex. rel.* DUQUOIN BURGESS**<br>*109 Waltman Place NE*<br>*Washington, DC 20011*<br><br>**BRINGING THIS ACTION ON BEHALF OF**<br>**THE UNITED STATES OF AMERICA**<br>*c/o William Barr, Esq.*<br>*Attorney General of the United States of America*<br>*U.S. Department of Justice*<br>*950 Pennsylvania Avenue NW,*<br>*Washington, DC 20530*<br><br>　　　　　*and*<br><br>*Jessie K. Liu, Esq.*<br>*U.S. Attorney for the District of Columbia*<br>*555 4th Street NW,*<br>*Washington, DC 20530*<br><br>　　　　　　　　　　*Plaintiffs,*<br><br>　　*vs.*<br><br>**NAVISTAR INTERNATIONAL, LLC**<br>*2701 Navistar Drive*<br>*Lisle, IL 60532*<br><br>**NAVISTAR DEFENSE, LLC**<br>*4201 Winfield Road*<br>*Warrensville, IL 60555-4025*<br><br>　　　　　　　　　　*Defendants.* | Case No. 13-cv-1463 (TSC)<br><br>**FIRST AMENDED COMPLAINT**<br><br>FOR VIOLATIONS OF THE<br>FEDERAL FALSE CLAIMS ACT<br>[31 U.S.C. § 3729 *et seq.*]<br><br>FILED UNDER SEAL PURSUANT<br>TO 31 U.S.C. § 3730(b)<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     PARTIES ................................................................................................................... 2

III.    JURISDICTION AND VENUE ................................................................................ 3

IV.     STATUTORY AND REGULATORY BACKGROUND ........................................... 5

   A.   The False Claims Act (FCA) ............................................................................... 5

   B.   Criminal Liability for Making False Statements to the Government ............................. 7

   C.   The Federal Acquisition Regulations (FAR) ............................................................ 7

        1.   Acquisition of Non-Commercial Goods Through a Negotiated Contract Under
             FAR Part 15. ............................................................................................... 9

             a.   The Certified Cost or Pricing Data Requirement ................................................ 10

             b.   Cost Analysis of Non-Commercial Goods. ...................................................... 11

             c.   Exceptions to and Waivers from the Certified Cost or Pricing Data
                  Requirement. ......................................................................................... 12

             d.   Price Analysis of Non-Commercial Goods ..................................................... 14

             e.   Summary. ............................................................................................. 16

        2.   Acquisition of Commercial Items Under FAR Part 12 ............................................. 17

             a.   Commercial Item Status ............................................................................ 17

             b.   Implications of Commercial Item Status. ....................................................... 19

             c.   Price Analysis of Commercial Goods ............................................................ 20

             d.   Summary. ............................................................................................. 24

        3.   False Statements in Bids. ................................................................................ 25

V.      SUBSTANTIVE ALLEGATIONS ............................................................................ 26

   A.   MRAP Contract Overview .................................................................................. 27

        1.   History of the MRAP Acquisition. ..................................................................... 27

        2.   Navistar's MRAP Contract. ............................................................................. 30

   B.   Navistar Defense's Fraudulent Misrepresentations Concerning the 7400 Chassis ........ 30

        1.   Initial Contract Award and Definitization in Alpha Sessions .................................... 32

        2.   Navistar Defense's False Representations Concerning the 7400 Chassis. ................... 36

        3.   Damages to the Government Resulting from Navistar Defense's Fraudulent
             Misrepresentations Concerning the 7400 Chassis. ................................................ 41

C.   Navistar Defense's Fraudulent Misrepresentations Concerning the MaxxForce
D9.3I6 Engine ........................................................................................................ 41

  1.   Navistar Defense's False Representations Concerning the MaxxForce
D9.3I6 Engine. ............................................................................................. 42

  2.   Damages to the Government Resulting from Navistar Defense's Fraudulent
Misrepresentations Concerning the MaxxForce D9.3I6 Engine................................ 46

D.   Navistar Defense's Fraudulent Misrepresentations in Connection with the
ISS Upgrade ........................................................................................................ 46

  1.   Navistar Defense's Efforts to Hide Cost Data During the Preparation of the ISS
Proposal........................................................................................................ 48

  2.   Navistar Defense's False Representations Concerning the ISS Kit............................ 49

  3.   Navistar Defense Presented Express False Certifications of its Cost and Pricing
Data, Which Were Material to the Government's Decision to Pay. ............................ 53

  4.   Damages to the Government Resulting from Navistar Defense's Fraudulent
Misrepresentations Concerning the ISS Upgrade. ...................................................... 56

E.   Total Damages to the Government as a Result of Navistar Defense's Fraudulent
Misrepresentations Relating to the MRAP Contract ...................................................... 60

F.   Navistar Defense's C-Suite Was Aware of and Supported the Company's
Fraudulent Misrepresentations to the Government ...................................................... 61

VI.   COUNTS .......................................................................................................... 64

VII.   PRAYER FOR RELIEF................................................................................................. 68

VIII.   DEMAND FOR JURY TRIAL....................................................................................... 68

## GLOSSARY

| | |
|---|---|
| **CAS** | Cost Accounting Standards |
| **CBOM** | Consolidated Bill of Materials |
| **CO** | Contracting Officer |
| **DCAA** | Defense Contract Auditing Agency |
| **DFARS** | Defense Federal Acquisition Regulation Supplement |
| **DO** | Delivery Order |
| **DoD** | Department of Defense |
| **FAR** | Federal Acquisition Regulation |
| **FCA** | False Claims Act |
| **FERA** | Fraud Enforcement and Recovery Act |
| **G&A** | General and Administrative Costs |
| **IED** | Improvised Explosive Devise |
| **ISS** | Independent Suspension System |
| **M&H** | Material and Handling Costs |
| **MRAP** | Mine-Resistant Ambush Protected |
| **TINA** | Truth in Negotiations Act |

## LIST OF NAVISTAR DEFENSE EMPLOYEES

| | |
|---|---|
| **Duquoin Burgess** | Contracts Manager (2009–12), Director of Contracts (2012) |
| **Archie Massicotte** | President of Navistar Defense |
| **Robert Walsh** | Vice President of Navistar Defense |
| **Candace Tabor** | Director of Finance (2009–11), Chief Financial Officer (2011–14) |
| **James Feller** | Director of Compliance, Pricing, and Contracts |
| **Michael Cavanaugh** | Pricing Manager |
| **Linda DiToro** | Director of Contracts (2008–09) |
| **Michael Lyons** | Manager of Government Contracts |
| **Mary Gillie** | Manager of Financing |

On behalf of The United States of America, Plaintiff-Relator Duquoin Burgess ("Relator") files this *qui tam* Complaint under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. ("FCA") against defendants Navistar International, LLC ("Navistar International") and Navistar Defense, LLC ("Navistar Defense") (jointly, "Defendants"), and alleges as follows:

## I.      INTRODUCTION

1.      This *qui tam* action arises out of Defendants' pervasive and long-running scheme to charge the U.S. Government wildly inflated prices for components of Mine-Resistant, Ambush-Protected ("MRAP") vehicles, which were critical to the Government's military efforts in Iraq and Afghanistan.

2.      Defendants knowingly presented forged and highly misleading documents to the Government for purposes of inducing the Government to award Defendants a multi-billion-dollar contract and various subsequent contract actions.

3.      Specifically, Defendants presented forged invoices, fabricated catalogue prices, and other fraudulent and misleading documents to support alleged "commercial prices" of various MRAP components, including the vehicles' chassis, engines, and suspension systems.

4.      The forged and fraudulent documents presented to the Government served to mask that these components either had no commercial sales history at all, or when they did, that the true commercial price was as little as half the price that Defendants charged the Government.

5.      Defendants certified their false and misleading cost and pricing data on all but one of the delivery orders placed under the contract.

6.      Navistar Defense's executive leadership—including the company's President and Vice President—was aware of, supported, and participated in perpetrating this extensive fraud upon the Government.

7.     Employees who voiced concerns about Defendants' pricing practices were accused of being more loyal to the customer (*i.e.*, the Government) than to the company, and their positions were threatened.

8.     On a conservative estimate, the Government has suffered approximately $1.28 billion in single damages as a result of Defendants' fraudulent conduct.

## II.   PARTIES

9.     **Relator Duquoin Burgess** is a resident of Washington, D.C. At all times relevant herein, he worked as a member of the Contract Management Department for Navistar Defense, LLC, first in Warrenville, Illinois and then in Lisle, Illinois. Relator's duties included ensuring that contract activities performed by the Program Management, Operations, Logistics, Quality, Accounting, Finance, and Engineering teams were in full compliance with legal and governmental regulations such as Federal Acquisition Regulations ("FAR"), Department of Defense Federal Acquisition Regulation Supplement ("DFARS"), Cost Accounting Standards ("CAS"), and Defense Contract Audit Agency ("DCAA") rules. While employed by Navistar Defense LLC, Relator negotiated a variety of contracts including Firm Fixed Price, Indefinite Delivery Indefinite Quantity, Time and Material, Cost Plus Fixed Fee, Cost Plus Award Fee, Basic Ordering Agreement, and Blanket Purchase Agreements. As a result of working in these positions, he gained knowledge about a variety of Navistar contracts. Relator managed a team of contract professionals, ranging from Contract Coordinators to Senior Managers. Relator was employed by Navistar Defense LLC from March 9, 2009 to October 30, 2012. In this capacity, he gained direct and independent knowledge of the allegations contained in this Complaint.

10.     **Defendant Navistar International Corporation** is an American holding company that owns various truck, bus, van, spare parts, and engine manufacturing and service companies.

Navistar International is headquartered in Lisle, Illinois, and employs approximately 16,500 employees. Navistar International's annual revenue was $10.775 billion in the 2013 fiscal year. Navistar International's products, parts, and services are sold through a network of nearly 1,000 dealer outlets in the United States, Canada, Brazil, and Mexico and more than 60 dealers in 90 countries throughout the world. Navistar International also provides financing for its customers and distributors through its wholly owned subsidiary, Navistar Financial Corporation. Navistar International has been registered to do business in Washington, D.C. since February 7, 1966.

11.     **Defendant Navistar Defense** is a wholly-owned subsidiary of Defendant Navistar International and headquartered in Lisle, Illinois. Navistar Defense originated as International Harvester Company, a company founded in 1902. International Harvester Company became the International Military and Government division of Defendant Navistar International, when it was acquired by the latter company in 1986. The division has been doing business under the name of Navistar Defense from 2003 to the present. Navistar Defense manufactures tactical wheeled vehicles for military, law enforcement, and government purchasers. In the period from 2004 to 2018, Navistar Defense has delivered approximately 37,000 tactical vehicles to customers. On December 3, 2018, Cerberus Capital Management acquired a 70% interest in Navistar Defense. From August 27, 2010 to the present, Defendant Navistar Defense has leased an office suite in 1747 Pennsylvania Avenue NW, Washington, District of Columbia.

## III.    JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject-matter of this action under 28 U.S.C. § 1331, as this civil action arises under federal law, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under the FCA.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

3732(a), which authorizes nationwide service of process, as Defendants have minimum contacts with this jurisdiction and Defendants can be found in, and transact business within, this judicial district.

14.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants transact business in this district. Defendant Navistar International has been registered to do business in the District of Columbia since 1966. Defendant Navistar International transacts business in the District of Columbia through its wholly-owned subsidiary Navistar Defense, as described in more detail below, as well as through its wholly-owned subsidiary International Trucks. For example, Defendant Navistar entered into delivery contracts that specified the District of Columbia as the "principal place of performance" of the contract. *See* Exhs. 1, 2.

15.     Defendant Navistar Defense has leased an office in Washington, D.C. from August 27, 2010 to the present. This office served as the home base for Navistar Defense employees working in various departments (including Sustainment, Communications and Government Relations) from 2010 to 2014. In addition, negotiations relating to the contract at issue in this Complaint occurred in the Defendants' Washington, D.C. office. Specifically, Relator conducted negotiations of modifications to and delivery orders under the contract governing the Government's procurement of Mine-Resistant Ambush Protected ("MRAP") vehicles in Navistar Defense's Washington, D.C. office in January 2010. On information and belief, numerous meetings between representatives of the Government and employees of Navistar Defense have taken place in the Washington, D.C. office of Navistar Defense.

16.     The facts and circumstances which give rise to Defendants' violation of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or

investigation, nor in the news media, as enumerated in 31 U.S.C. § 3730(c)(4)(A).

17.    To the extent that there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relator has independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this *qui tam* action based on that information.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.  THE FALSE CLAIMS ACT (FCA)

18.    The FCA, 31 U.S.C. §§ 3729 *et seq*., was originally enacted in 1863 during the Civil War and was substantially amended by the False Claims Amendments Act of 1986, as signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the FCA. Congress acted upon finding that (a) fraud in federal programs and procurement is pervasive and that (b) the FCA—which Congress characterized as the primary tool for combating fraud in Government contracting—was in need of modernization.

19.    The FCA is the Government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N 5266.

20.    The FCA provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $22,363 for each such claim, plus three times the amount of the damages sustained by the Government, including attorneys' fees. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

21.     The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action on behalf of the Government. A person who brings a *qui tam* suit under the FCA as a relator on behalf of the Government is entitled to share in any recovery.

22.     A *qui tam* complaint is to be filed under seal for sixty days (without service on the Defendants during such sixty-day period). This enables the Government (a) to conduct its own investigation without Defendants' knowledge or awareness, and (b) to determine whether to join the action.

23.     The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA"), passed by Congress and signed into law on May 20, 2009, for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the False Claims Act. Pub. L. No. 111-21, 123 Stat. 1617 (2009).

24.     While most of the new provisions apply only to claims after the effective date of the statute, Congress determined that 31 U.S.C. § 3729(a)(l)(B), which revised the former section designated as 31 U.S.C. § 3729(a)(2) pertaining to liability for false statements, ". . . shall take effect as if enacted on June 7, 2008, and shall apply to all claims . . . that are pending on or after that date." 123 Stat. at 1625 (see note following 31 U.S.C. § 3729).

25.     For claims prior to June 7, 2008, 31 U.S.C. § 3729(a)(2) holds liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

26.     For claims after June 7, 2008, 31 U.S.C. § 3729(a)(1)(B) holds liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

27.     To establish that a defendant acted "knowingly" under the FCA, no "proof of specific intent to defraud" is required; it is sufficient when a defendant knows that information provided is false, acts in deliberate ignorance of its truth or falsity, or acts in reckless disregard of its truth or falsity. 31 U.S.C. § 3729(b)(1).

28.     For purposes of the FCA, a "claim" is any request for money submitted to the contract, which covers both false claims made while entering into a contract with the federal Government as well as claims for payment under an existing contract. 31 U.S.C. § 3729(b)(2).

## B.  CRIMINAL LIABILITY FOR MAKING FALSE STATEMENTS TO THE GOVERNMENT

29.     The vital importance of complete truthfulness in dealings with the Government is underscored by the federal statutes that expose contractors who present false statements to the Government not just to civil, but also to criminal liability.

30.     Specifically, 18 U.S.C. § 287 provides that the making or presenting of claims for payment to the Government while "knowing such claim to be false, fictitious, or fraudulent" exposes the fraudster to "imprison[ment] not more than five years and . . . a fine."

31.     Furthermore, 18 U.S.C. § 1001 likewise imposes a prison term of up to five years for (a) "falsifyi[ng], conceal[ing], or cover[ing] up . . . a material fact," for (b) "mak[ing] any materially false, fictitious, or fraudulent statement or representation" to the Government, and for (c) "mak[ing] or us[ing] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."

32.     As these statutes make clear, submission of forged documents and records to the Government is an especially grave offense.

## C.  THE FEDERAL ACQUISITION REGULATIONS (FAR)

33.     The Federal Acquisition Regulations are the principal set of rules governing

7

government procurement in the United States. FAR governs the acquisition process by which executive agencies of the United States federal government acquire (i.e., purchase or lease) goods and services by contract with appropriated funds. 48 C.F.R. § 1.101.

34.     All federal agencies must comply with the FAR unless specifically exempted.[1] As relevant here, the Department of Defense ("DoD") is not exempted from FAR.

35.     FAR distinguishes between different contracting methods and sets out specific rules for each method in FAR Parts 12 through 18. *See* 48 C.F.R. §§ 13.000–18.205. As relevant here, **negotiated contracts** are governed by FAR Part 15, 48 C.F.R. §§ 15.000 *et seq*. In addition, FAR sets out specific rules for acquisition of **commercial items**, governed by FAR Part 12, 48 C.F.R. §§ 12.000 *et seq*.

36.     As detailed below, a Contracting Officer ("CO") must determine whether the price of an item is "fair and reasonable" regardless of whether the item is commercial or not—the only difference is the method by which price reasonableness is to be determined. For non-commercial items, a CO must request—and an offeror must provide—"certified cost or pricing data," whereas for commercial items, no certified data is required.[2] However, for every acquisition, a CO must obtain sufficient data to determine whether the price the Government pays is "fair and reasonable," and a CO must therefore in all circumstances "[o]btain the type and quantity of data necessary to establish a fair and reasonable price . . ." 48 C.F.R. § 15.402(a)(3).

37.     Government contractors are bound by the Contractor Code of Business Ethics and Conduct, which obligates them to actively enforce the FCA's ban on false representations. Failure

---

[1] *See, e.g.*, 49 U.S.C § 40110(d)(2) (exempting Federal Aviation Administration); 31 U.S.C § 5136 (exempting U.S. Mint).

[2] There are additional exceptions to the requirement that contractors must provide certified cost or pricing data, beyond those for commercial items. These are discussed in ¶¶ 59–64 below.

to abide by the statutory ban on misrepresentations exposes contractors both to liability under the FCA and to disciplinary agency action, including suspension and disbarment.

1. **Acquisition of Non-Commercial Goods Through a Negotiated Contract Under FAR Part 15.**

38.     Any government contract awarded using a method other than a sealed bidding procedure is a "negotiated contract." 48 C.F.R. § 15.000. If the aggregate value of the contract exceeds the simplified acquisition threshold, such contracts are governed by FAR Part 15. *See* 48 C.F.R. § 13.000 (carving out agreements with aggregate values below the simplified acquisition threshold).

39.     The aggregate value of each contract at issue in this matter exceeds the simplified acquisition threshold as defined in 48 C.F.R. § 2.101. Consequently, rules governing acquisitions that fall below the threshold will be set aside in the remainder of this Complaint.

40.     FAR Part 15 sets out detailed, mandatory "cost and price negotiation policies and procedures for pricing negotiated prime contracts (including subcontracts) and contract modifications . . . " 48 C.F.R. § 15.400.

41.     As relevant here, in contract negotiations governed by FAR Part 15, COs are under an obligation to "[p]urchase supplies and services at fair and reasonable prices," 48 C.F.R. § 15.402(a), and must therefore make a determination whether the price of goods offered is "fair and reasonable." In short, COs must make what is known as a "price reasonableness determination." *See also* 48 C.F.R. § 15.404-1(a)(1) ("The contracting officer is responsible for evaluating the reasonableness of the offered prices.").

42.     To make a price reasonableness determination in a negotiated contract acquisition, a CO is required to obtain "certified cost or pricing data," unless an exception to this requirement applies. 48 C.F.R. §§ 15.402(a)(1); 15.403-4(a)(1).

9

43.     When a CO is not required to obtain certified cost or pricing data, the CO remains under an obligation to make a price reasonableness determination, and the CO must therefore "obtain data other than certified cost or pricing data as necessary to establish a fair and reasonable price" when certified data is not required. 48 C.F.R. § 15.402(a)(2).

44.     The certified cost or pricing data requirement and the exceptions to the requirement that are set out in FAR Part 15, and discussed in detail below, all serve to implement the Truth in Negotiations Act ("TINA"), 10 U.S.C § 2306a.

### a. The Certified Cost or Pricing Data Requirement.

45.     "Certified cost or pricing data" is defined under FAR as "'cost or pricing data' that were required to be submitted . . . and have been certified, or are required to be certified . . ." 48 C.F.R. § 2.101. The required certification "states that, to the best of the person's knowledge and belief, the cost or pricing data are accurate, complete, and current as of a date certain before contract award." *Id*.

46.     "Cost or pricing data" is defined under FAR as "all facts that, as of the date of price agreement, or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly." *Id*.

47.     48 C.F.R. § 2.101 specifically provides that "cost or pricing data" include "[v]endor quotations."

48.     To certify cost or pricing data, the offeror of goods must attest that, to the best of his or her knowledge, the cost or pricing data provided are "accurate, complete, and current." 48 C.F.R. § 15.406-2. The executed certificate becomes part of the contract file. *Id*.

49.     When certified cost or pricing data are required, offerors must provide the data and

a certificate when submitting a proposal. 48 C.F.R. § 15.403-4(b).

50.      Under 48 C.F.R. § 15.403-4(a), when certified cost or pricing data is required, a CO must obtain an executed certificate before he or she can:

- Award a negotiated contract; or
- Modify a negotiated contract.

51.      An offeror who is required to provide certified cost or pricing data is under a duty to obtain "information reasonably available at the time of the agreement" if such information would show "that the negotiated price was not based on accurate, complete, and current data." 48 C.F.R. § 15.406-2. Notably, a "lack of personal knowledge" does not excuse a contractor who failed to provide such data. *Id*.

52.      Certified cost or pricing data must be submitted in a format prescribed by FAR Part 15, Table 15-2 ("15-2 Table"). The instructions for completing a 15-2 Table set out in FAR are attached to this Complaint as Exhibit 3.

**b.  Cost Analysis of Non-Commercial Goods.**

53.      When certified cost or pricing data is required, a CO must discharge his or her duty to evaluate the reasonableness of the offered prices by performing a cost analysis. 48 C.F.R. § 15.404-1(a)(3).

54.      Cost analysis refers to "the review and evaluation of any separate cost elements and profit or fee in an offeror's or contractor's proposal, as needed to determine a fair and reasonable price or to determine cost realism, and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency." 48 C.F.R. § 15.404-1(c)(1).

55.      48 C.F.R. § 15.404-1(c)(2) provides the following non-exhaustive list of techniques and procedures a CO may use to conduct a cost analysis:

(i) Verification of cost data or pricing data and evaluation of cost elements . . .

(ii) Evaluating the effect of the offeror's current practices on future costs . . .

(iii) Comparison of costs proposed by the offeror for individual cost elements with

(A) Actual costs previously incurred by the same offeror;

(B) Previous cost estimates from the offeror or from other offerors for the same or similar items;

(C) Other cost estimates received in response to the Government's request;

(D) Independent Government cost estimates by technical personnel . . .

56.     The purpose of performing a cost analysis is to determine whether a proposed price is "fair and reasonable." 48 C.F.R. § 15.404-1(a).

57.     48 C.F.R. § 31.201-3(a) explains the concept of "cost reasonableness" as follows:

> A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. **Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints**. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable (emphasis supplied).

58.     Whenever a CO used a cost analysis to make a price reasonableness determination, the contract file must include "[a] summary of the contractor's proposal," and this summary must "address each major cost element." 48 C.F.R. § 15.406-3(a)(7).

**c.  Exceptions to and Waivers from the Certified Cost or Pricing Data Requirement.**

59.     COs are under an obligation to determine whether an exception applies to the general rule requiring certified cost and pricing data. 48 C.F.R. § 15.403-4(a)(1).

60.     As relevant here, 48 C.F.R. § 15.403-1(b) sets out the following exceptions to the

rule that certified cost and pricing data are required:[3]

> (i) The CO has determined that prices agreed upon are based on "adequate price competition";
>
> (ii) The CO has determined that the acquisition concerns a commercial item, or is modifying a contract or subcontract for commercial items; or
>
> (ii) A waiver has been granted.

61.     **Adequate price competition** exists only when (a) two or more offerors, who are "competing independently," submit "priced offers that satisfy the Government's expressed requirement[s]"; (b) the Government selects one of these offerors, and "price is a substantial factor" in the Government's decision; and (c) "[t]here is no finding that the price of the otherwise successful offeror is unreasonable." 48 C.F.R. § 15.403-1(c)(1).

62.     When adequate price competition exists, a CO should not request certified cost or pricing data. However, the CO remains under an obligation to determine whether the price the Government pays is "fair and reasonable." *See* 48 C.F.R. § 15.402(a)(2) (explaining that, when certified cost or pricing data are not required, the CO "shall obtain data other than certified cost or pricing data as necessary to establish a fair and reasonable price").

63.     A **waiver** of the requirement that certified cost or price data be submitted—what is known as a "TINA Waiver"—may be granted only "if the price can be determined to be fair and reasonable without submission of certified cost or pricing data." 48 C.F.R. § 15.403-1(c)(4). To illustrate: "[I]f certified cost or pricing data were furnished on previous production buys and the contracting officer determines such data are sufficient, when combined with updated data, a waiver may be granted." *Id*.

---

[3] 48 C.F.R. § 15.403-1(b)(3) further exempts contracts where prices agreed upon are based on prices set by law or regulation. This exception has no bearing on the contracts discussed in Section V of this Complaint.

64.     When a waiver has been granted, a CO should not request certified cost or pricing data. However, a CO unequivocally remains under an obligation to determine whether the price the Government pays is "fair and reasonable." *See* 48 C.F.R. § 15.402(a)(2) (explaining that, when certified cost or pricing data are not required, the CO "shall obtain data other than certified cost or pricing data as necessary to establish a fair and reasonable price"); 48 C.F.R. § 15.403-1(c)(4) (noting that waiver may be granted only when price reasonableness determination can be made on other basis).

65.     The exception for **commercial item** acquisitions is discussed in detail below, in ¶¶ 75–102 of this Complaint.

### d.  Price Analysis of Non-Commercial Goods.

66.     When cost analysis is required to make a price reasonableness determination, a CO must supplement his/her analysis with a price analysis "to verify that the overall price offered is fair and reasonable." 48 C.F.R. § 15.404-1(a)(3).

67.     The term "price analysis" refers to "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." 48 C.F.R. § 15.404-1(b)(1). Price analysis, like cost analysis, serves to "ensure that the final agreed-to price is fair and reasonable." 48 C.F.R. § 15.404-1(a).

68.     To perform a price analysis, a CO "at a minimum . . . shall obtain appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determine if the data is adequate for evaluating the reasonableness of the price." 48 C.F.R. § 15.404-1(b)(1).[4]

---

[4] As alleged in ¶¶ 96–100 *infra*, data "other than" certified cost and pricing data is understood to include the exact same data that contracts would provide when required to submit certified data, except without certification.

69.     As relevant here, the only circumstance in which a CO is not required to obtain data showing "the prices at which the same or similar items have previously been sold" is when the CO has made a determination that "prices agreed upon are based on adequate price competition." *See* 48 C.F.R. § 15.404-1(b)(1); § 15.403-1(b)(1).[5]

70.     As detailed in 48 C.F.R. § 15.403-1(c)(1), a finding of "adequate price competition" requires that a CO determine that three conditions are met:

(A) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement;

(B) Award will be made to the offeror whose proposal represents the best value . . . where price is a substantial factor in source selection; and

(C) There is no finding that the price of the otherwise successful offeror is unreasonable.

71.     Furthermore, "[p]rice analysis may include evaluating data other than certified cost or pricing data obtained from the offeror or contractor when there is no other means for determining a fair and reasonable price." *Id.*

72.     48 C.F.R. § 15.404-1(b)(2) supplies, in relevant part, the following non-exhaustive list of "techniques and procedures" that a CO can employ to perform the required price analysis:

(i) Comparison of proposed prices received in response to the solicitation. . . .

(ii) Comparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items.[6] . . . .

(iv) Comparison with competitive published price lists, published market prices of

---

[5] The other circumstance in which a CO is not required to obtain this data is when "the contracting officer determines that prices agreed upon are based on prices set by law or regulation." *See* 48 C.F.R. § 15.404-1(b)(1) (noting exception); § 15.403-1 (detailing conditions). This condition does not apply to any of the acquisitions discussed in this Complaint.

[6] This suggested technique is subject to two important limitations: (a) "The prior price must be a valid basis for comparison," meaning that "[i]f there has been a significant time lapse between the last acquisition and the present one, [or] if the terms and conditions of the acquisition are significantly different, or if the reasonableness of the prior price is uncertain," a CO should be hesitant to rely on prior price; and (b) "The prior price must be adjusted to account for materially differing terms and conditions, quantities and market and economic factors." 48 C.F.R. § 15.404-1(b)(2)(ii).

commodities, similar indexes, and discount or rebate arrangements.

(v) Comparison of proposed prices with independent Government cost estimates.

(vi) Comparison of proposed prices with prices obtained through market research for the same or similar items.

(vii) Analysis of data other than certified cost or pricing data provided by the offeror.

73.     In brief, a CO must normally perform a price analysis in addition to a cost analysis for acquisitions subject to FAR Part 15. Price analysis is discussed in further detail in ¶¶ 88–101 of this Complaint.

### e.  Summary.

74.     In sum, the provisions governing acquisitions through negotiated contracts set out in FAR Part 15 provide that:

- In a negotiated contract acquisition governed by FAR 15, a CO must invariably make a **price reasonableness determination**, to comply with the obligation to ensure that the Government pays "fair and reasonable" prices under 48 C.F.R. § 15.402(a) and 48 C.F.R. § 15.404-1(a)(1);

- To comply with this obligation, as a general rule, a CO must normally request **certified cost or pricing data** from every potential seller under 48 C.F.R. § 15.403-4(a)(1), unless an exception applies;

- Certified cost or pricing data must be presented in the form of a 15-2 Table;

- When certified cost or pricing data are required, a CO must perform a **cost analysis** under 48 C.F.R. § 15.404-1(c);

- When a CO is required to perform a cost analysis, the CO must supplement his/ her analysis with a **price analysis** "to verify that the overall price offered is fair and reasonable" under 48 C.F.R. § 15.404-1(a)(3);

16

- **Exceptions** to the requirement that certified cost or pricing data must be provided cover (a) acquisitions with respect to which there is adequate price competition; (b) acquisitions for which a waiver has been granted; and (c) acquisitions of commercial items. 48 C.F.R § 15.403-1(b).

- Even if an exception applies, the CO remains under an obligation to determine whether a price is "fair and reasonable," and therefore under an obligation to obtain information sufficient to make this determination under 48 C.F.R. § 15.403-1(c)(4).

- When a CO relied on a cost analysis to determine price reasonableness, the contract file must include "[a] summary of the contractor's proposal" which "address[es] each major cost element" under 48 C.F.R. § 15.406-3(a)(7).

### 2. Acquisition of Commercial Items Under FAR Part 12.

75.     FAR Part 12 sets out specific rules and procedures governing the acquisition of commercial items. *See* 48 C.F.R. §§ 12.100 *et seq*. FAR 12 rules and procedures are to be used "in conjunction with the policies and procedures for solicitation, evaluation and award" of contracts that are set forth in FAR Parts 13 through 15. *See* 48 C.F.R. § 12.102(b); 48 C.F.R. § 12.203.

### a. Commercial Item Status.

76.     48 C.F.R. § 2.101 provides the following principal definition of "commercial item":

Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and -

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public[.]

77.     Furthermore, items that "evolved" from items that meet the above definition and that will become available in the commercial market place are also considered commercial items,

17

as are items that would meet this definition "but for [m]odifications of a type customarily available in the commercial marketplace," or that would meet it but for "minor modifications" that are not commercially available but which were "made to meet Federal Government requirements." *Id*.

78.     "Minor modifications" are defined as "modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process." *Id*. Factors to be considered in determining whether a modification is minor "include the value and size of the modification and the comparative value and size of the final product; while "[d]ollar values and percentages may be used as guideposts," these "are not conclusive evidence that a modification is minor." *Id*.

79.     In addition, any combination of commercial items is also considered a commercial item, provide that the items "are of a type customarily combined and sold in combination to the general public." *Id*.

80.     A "commercially available off-the-shelf" item is an item that (a) meets § 2.101's definition of commerciality, (b) is sold "in substantial quantities" in the commercial marketplace; and (c) is sold to the Government "without modification, in the same form in which it is sold in the commercial marketplace." 48 C.F.R. § 2.101. An off-the-shelf item is subject to "all of the policies that apply to commercial items" unless an exception is explicitly provided for by FAR. 48 C.F.R. § 12.103. None of the exceptions are pertinent to the allegations in this Complaint.

81.     The rules and procedures set forth in FAR Part 12 apply only to the acquisition of goods that **in fact** meet § 2.101's definition of "commercial item." 48 C.F.R. § 12.102(a).[7] These rules therefore do not apply to an acquisition of a non-commercial item that is (erroneously) treated

---

[7] Subsections (e)–(g) of 48 C.F.R. § 12.102 enumerate a small number of exceptions to this general rule. None of the exceptions apply to the acquisition of any Navistar goods discussed herein.

as a commercial item by the contracting parties.

82.     COs making acquisitions on behalf of the DoD are subject to FAR as well as the DoD-specific supplement to FAR, DFARS (Defense Federal Acquisition Regulation Supplement). *See* DFARS 201.104.

83.     DFARS 212.102(a) makes explicit that a CO making a commercial item acquisition under FAR Part 12 must, when the value of the acquisition exceeds $1 million, must "[d]etermine in writing that the acquisition meets the commercial item definition in [48 C.F.R. §] 2.101 . . ." and "[i]nclude the written determination in the contract file . . ."

### b.  Implications of Commercial Item Status.

84.     The most important characteristic of acquisitions of commercial items for purposes of the allegations detailed in this Complaint is that whereas offerors of non-commercial items are required to provide the Government with "certified cost or pricing data" (as detailed above), a CO "shall not require certified cost or pricing data to support any action (contracts, subcontracts, or modifications) . . . [w]hen a commercial item is being acquired." 48 C.F.R. § 15.403-1(b)(3).

85.     However, while "certified cost or pricing data" is not required in the acquisition of a commercial item, a CO who seeks to purchase a commercial item nonetheless "**must** establish price reasonableness." 48 C.F.R. § 12.209 (emphasis supplied).[8]

---

[8] The process for determining if the price of a commercial item is "fair and reasonable" is dependent on the nature of the acquisition. The paragraphs that follow detail the process COs must follow when determining price reasonableness for commercial items procured through a negotiated contract. The other types of acquisitions identified by 48 C.F.R. § 12.209 are (a) acquisitions of commercial items that fall below the simplified acquisition threshold, and (b) acquisitions of commercial items through the submission of sealed bids. Price reasonableness determinations for procurements of type (a) are governed by 48 C.F.R. § 13.106-3; procurements of type (b) are governed by 48 C.F.R. § 14.408-2. *See* 48 C.F.R. § 12.209. The acquisitions discussed in Section V of this Complaint are all procurements through negotiated contracts; insofar as these items were "commercial items," their acquisition would therefore be governed by 48 C.F.R. § 15.403-1(c). *See* 48 C.F.R. § 12.209.

86.     A determination that an item is "commercial" does nothing to establish that its price is "fair and reasonable," and a CO remains under an obligation to make a price reasonableness determination, irrespective of whether the acquisition is of a commercial item or a non-commercial item. *See* Exh. 4 (instructing DoD COs that "[w]hether we deem an item to be commercial or not, the key consideration should be: 'Am I paying a fair and reasonable price?'").

87.     To comply with the obligation to determine price reasonableness of a commercial item, it is insufficient for a CO to simply rely on the price listed in a catalog that has been provided by the offeror, because "[t]he fact that a price is included in a catalog does not, in and of itself, make it fair and reasonable." 48 C.F.R. § 12.209.

### c.  Price Analysis of Commercial Goods.

88.     When a CO purchases a commercial item through a negotiated contract, the CO must "[a]t a minimum . . . use price analysis to determine whether the price is fair and reasonable." 48 C.F.R. § 15.403-3(c)(1). In other words, to comply with his or her obligation to determine whether the price of a commercial item is "fair and reasonable," a CO is required to perform a price analysis.

89.     As alleged above, the term "price analysis" refers to "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." 48 C.F.R. § 15.404-1(b)(1).

90.     As alleged above, to perform a price analysis, a CO "at a minimum . . . shall obtain appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determine if the data is adequate for evaluating the reasonableness of the price." *Id.*[9]

---

[9] As alleged above, a CO is not required to obtain this data if (a) "the contracting officer determines

91.     Specifically, as detailed in 48 C.F.R. § 15.403-3(a)(1), COs must take the following steps when certified cost or pricing data is not required (as, e.g., when the acquisition concerns a commercial item):

> (i) Obtain whatever data are available from Government or other secondary sources and use that data in determining a fair and reasonable price;
>
> (ii) Require submission of data other than certified cost or pricing data . . . from the offeror to the extent necessary to determine a fair and reasonable price . . . if the contracting officer determines that adequate data from sources other than the offeror are not available. This includes requiring data from an offeror to support a cost realism analysis;
>
> (iii) Consider whether cost data are necessary to determine a fair and reasonable price when there is not adequate price competition; [and]
>
> (iv) Require that the data submitted by the offeror include, at a minimum, appropriate data on the prices at which the same item or similar items have previously been sold, adequate for determining the reasonableness of the price unless an exception . . . applies . . .

92.     As alleged above, 48 C.F.R. § 15.404-1(b)(2) provides, in relevant part, the following non-exhaustive list of "techniques and procedures" that a CO can employ to perform the required price analysis:

> (i) Comparison of proposed prices received in response to the solicitation. . . .
>
> (ii) Comparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items.[10] . . . .
>
> (iv) Comparison with competitive published price lists, published market prices of commodities, similar indexes, and discount or rebate arrangements.

---

that prices agreed upon are based on adequate price competition," or (b) when "the contracting officer determines that prices agreed upon are based on prices set by law or regulation." *See* 48 C.F.R. § 15.404-1(b) (noting exceptions); § 15.403-1 (detailing conditions). Note that § 15.404-1(b) does **not** provide for an exemption simply on the basis of commercial item status.

[10] This suggested technique is subject to two limitations: (a) "The prior price must be a valid basis for comparison," meaning that "[i]f there has been a significant time lapse between the last acquisition and the present one, [or] if the terms and conditions of the acquisition are significantly different, or if the reasonableness of the prior price is uncertain," a CO should be hesitant to rely on prior price; and (b) "The prior price must be adjusted to account for materially differing terms and conditions, quantities and market and economic factors." 48 C.F.R. § 15.404-1(b)(2)(ii).

(v) Comparison of proposed prices with independent Government cost estimates.

(vi) Comparison of proposed prices with prices obtained through market research for the same or similar items.

(vii) Analysis of data other than certified cost or pricing data provided by the offeror.

93.     Crucially, "[p]rice analysis may include evaluating data other than certified cost or pricing data obtained from the offeror or contractor when there is no other means for determining a fair and reasonable price." 48 C.F.R. § 15.404-1(b)(1).

94.     That COs may use "data other than certified cost or pricing data" to determine whether a price is "fair and reasonable" is reiterated by other FAR provisions. For example, 48 C.F.R. § 15.403-1(b) provides that a CO "may require data other than certified cost or pricing data . . . to support a determination of a fair and reasonable price" when the CO cannot request certified data.

95.     The FAR does not merely *permit* COs to obtain "data other than certified cost and pricing data," but in fact *requires* them to do so under various circumstances. First, when COs have no other means of determining whether the price of a commercial item is "fair and reasonable," COs "shall obtain data other than certified cost or pricing data from the offeror or contractor for all acquisitions (including commercial item acquisitions) . . ." under 48 C.F.R. § 15.404-1(b)(1). Second, 48 C.F.R. § 15.403-3(c)(1) also provides that "[i]f the contracting officer cannot determine whether an offered price is fair and reasonable, even after obtaining additional data from sources other than the offeror, then the contracting officer shall require the offeror to submit data other than certified cost or pricing data to support further analysis." Third, 48 C.F.R. § 15.403-3(a)(1)(ii) provides that "[i]n those acquisitions that do not require certified cost or pricing data, the contracting officer shall . . . [r]equire submission of data other than certified cost or pricing data . . . from the offeror to the extent necessary to determine a fair and reasonable price

. . . if the contracting officer determines that adequate data from sources other than the offeror are not available"). Fourth and finally, 48 C.F.R. § 15.402(a)(2) provides that COs "shall obtain data other than certified cost or pricing data as necessary to establish a fair and reasonable price . . ." when "certified cost or pricing data are not required . . ."

96.     48 C.F.R. § 2.101 defines "data other than certified cost or pricing data" as follows:

> Data other than certified cost or pricing data means pricing data, cost data, and judgmental information necessary for the contracting officer to determine a fair and reasonable price or to determine cost realism. **Such data may include the identical types of data as certified cost or pricing data . . . but without the certification.** The data may also include, for example, sales data and any information reasonably required to explain the offeror's estimating process, including, but not limited to -
>
> (1) The judgmental factors applied and the mathematical or other methods used in the estimate, including those used in projecting from known data; and
>
> (2) The nature and amount of any contingencies included in the proposed price (emphasis supplied).

97.     As this definition makes clear, the category of "data other than cost or pricing data" plainly encompasses "the identical types of data as certified cost or pricing data," except "without the certification." *Id*.

98.     As alleged above, "cost or pricing data" is defined as "all facts that, as of the date of price agreement, or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly." *Id*.

99.     Given that "data other than cost or pricing data" encompasses "the identical types of data as certified cost or pricing data," the category of "data other than cost or pricing data" comprises "all facts that . . . prudent buyers and sellers would reasonably expect to affect price negotiations significantly." 48 C.F.R. § 2.101. In other words, "data other than certified cost or pricing data" in effect encompasses everything that could reasonably affect price negotiations.

100.    Finally, because 48 C.F.R. § 2.101 specifically provides that "cost or pricing data" include "[v]endor quotations," it follows that "data other than certified cost or price data" also covers "vendor quotations."

101.    When a CO used a price analysis to make a price reasonableness determination, the contract file must include "[a] summary of the contractor's proposal," which in turn must "include the source and type of data used to support the determination." 48 C.F.R. § 15.406-3(a)(7).

### d.  Summary.

102.    In sum, the FAR provisions governing the acquisition of commercial items set out in Part 12 provide that:

- A CO **must** make a determination whether the price of a commercial item is "fair and reasonable" under 48 C.F.R. § 12.209;

- To make the required price reasonableness determination for a commercial item, a CO **cannot** simply rely on the price listed in the offeror's catalog, but must instead perform an independent price analysis under 48 C.F.R. § 12.209 and 48 C.F.R. § 15.403-3(c)(1);

- Price analysis includes, *inter alia*, comparisons of proposed prices with independent Government cost estimates, and comparisons with price lists and "discount or rebate arrangements" under 48 C.F.R. § 15.404-1(b)(2);

- To make the required price reasonableness determination, a CO **may** under all circumstances request "data other than certified cost or pricing data" under 48 C.F.R. § 15.403-1(b), § 15.403-3(a)(1)(ii), and § 15.404-1(b);

- A CO **must** require "data other than certified cost or pricing data" when the CO has no other means of determining whether a price is "fair and reasonable" under 48

C.F.R. § 15.403-3(a)(1)(ii), § 15.403-3(c)(1), and § 15.404-1(b)(1); and

- As explained in 48 C.F.R. § 2.101, "data other than certified cost or pricing data" encompasses the exact same data as "certified cost or pricing data" and differs only in that it is not accompanied by a mandatory certification, and thus encompasses "**all facts** that . . . prudent buyers and sellers would reasonably expect to affect price negotiations significantly," including "vendor quotations";

- The contract file must include a summary of the contractor's proposal, which in turn must "include the source and type of data used to support the determination" that the price paid was "fair and reasonable" under 48 C.F.R. § 15.406-3(a)(7).

### 3.  False Statements in Bids.

103.    The FAR, like the U.S. Code, considers truthfulness a vitally important aspect of the regulation of federal procurement.

104.     The prohibition on making false statements to the Government is exemplified by the following clause in 48 C.F.R. § 52.214-4, which must be inserted in all invitations to submit a bid for Government business:

> Bidders must provide full, accurate, and complete information as required by this solicitation and its attachments. The penalty for making false statements in bids is prescribed in 18 U.S.C. 1001.

105.    As alleged above, 18 U.S.C. § 1001 provides that contractors who knowingly make "false statements" or knowingly use "false writing[s] or document[s]" face a penalty of "imprison[ment of] not more than 5 years . . ."

106.    Thus, under 48 C.F.R. § 52.214-4, contractors who submit false statements or use falsified documents in a bid for a Government contract face not only civil liability under the FCA, but are also potentially subject to criminal liability.

## V.    SUBSTANTIVE ALLEGATIONS

107.    In 2003, Defendant Navistar had been selling motorized vehicles for decades, but had virtually no experience in selling vehicles to the Government. By 2007, Navistar's sales to the Government had grown from $0 to $3 billion annually. This explosive growth was the result of contracts that Defendant Navistar Defense, a wholly-owned subsidiary of Navistar International, had won with the DoD.[11]

108.    The primary source of Navistar Defense's revenue at that time was a contract to provide the Government with MRAP vehicles, a contract that had been awarded to Navistar Defense in January 2007.[12]

109.    At the completion of the contract's five-year life-cycle in 2012, the Government had paid Navistar Defense approximately $9 billion under this contract.

110.    As detailed below, on a conservative estimate, approximately $1.28 billion of the $9 billion committed by the Government was paid to Navistar Defense on the basis of fraudulent misrepresentations, including forged invoices, along with other fabricated and highly misleading documents, that induced the Government into paying wildly inflated prices for various components of the MRAP vehicles, including the vehicles' chassis, engine, and suspension system.

111.    Navistar Defense exploited the Government's need for vehicles that would provide American soldiers with the protection they needed in the field, and fraudulently charged the Government prices far exceeding those it charged other customers for the same parts and components. Throughout the entire MRAP procurement, Navistar Defense employees concealed

---

[11] Bob Tita, *Navistar's Mility Man: From Hotel Bar to the Pentagon, Exec Drove Truckmaker to $3 billion*, CHICAGO BUSINESS (Nov. 17, 2007), https://www.chicagobusiness.com/article/2007 1117/NEWS01/200027160/navistar-s-military-man.

[12] *See id.*

Navistar's costs and actual commercial prices from the Government, to thwart the Government's attempt to determine whether the Government paid a "fair and reasonable price," and to safeguard the excessive profits the company reaped under the MRAP Contract due to its fraudulent conduct.

112.    Navistar Defense's fraud in obtaining the MRAP contract and being awarded delivery orders under that contract was no mere oversight, resulting from the company's lack of experience in dealing with the Government. On more than one occasion, Navistar Defense employees created forged sales histories to support the inflated prices it charged the Government. This deliberate fraud was known to and supported by the company's executive leadership.

113.    Through these actions, Defendant Navistar Defense submitted and caused to be submitted numerous false claims for payment, in flagrant violation of the FCA.

## A.  MRAP CONTRACT OVERVIEW

### 1.  History of the MRAP Acquisition.

114.    In February 2005, the Marine Corps combatant commanders identified an operational need for armored tactical vehicles to protect Marines from improvised explosive devises ("IEDs"), rocket-propelled grenades, and small arms fire. There was also a requirement for more mine-resistant vehicles.

115.    While the Government had never made a large-scale procurement of MRAP vehicles, the procurement process was, of course, expected to be consistent with applicable laws and regulations.

116.    The Government required different categories of MRAPs for the different operations in Iraq. Thus, the Government procured three categories of MRAP vehicles: Category I, Category II, and Category III. Category I consisted of the smallest version of MRAPs, which could carry up to seven people, and were intended for operations in urban combat environments.

Category II MRAPs could carry up to eleven personnel and were used to support security, to transport troops and cargo, and for other missions. Finally, Category III MRAPs were the largest version; these could carry up to thirteen people, and were intended for mine and IED clearance operations.

117.    Because the Government had never purchased MRAP vehicles in large quantities before, and some contractors had not previously produced them, these three categories of MRAPs had to pass a four-phase development plan before being deployed in Iraq: Phase I, Phase II, Phase III, and initial operational test and evaluation. If an MRAP passed all four phases, it would be deployed in Iraq.

118.    Eight contractors were initially awarded an MRAP contract in 2007.[13] Of these eight, only five contractors passed all four phases: (1) Navistar, (2) BAE Tactical Vehicle Systems and BAE Ground Systems, (3) Force Protection Industries, (4) General Dynamics Land Systems, and (5) Textron Marine & Land Cadillac Gage.

119.    Subsequently, in 2008 the Government contracted with Oshkosh Defense as the sole contractor for a specialized version of the MRAP, the Mine Resistant Ambush Protected All-Terrain Vehicle, that was to be used in Iraq and on the rougher roads in Afghanistan.

120.    In sum, the Government could procure MRAP-type vehicles from any one of these six contractors or divert its procurement from one contractor and procure from another.

121.    From 2007–09, the Government procured MRAPs that were designed with mature technologies and were deployed mainly in Iraq.

---

[13] The eight initial contractors were: Oshkosh Truck Corporation; BAE Systems/Land Systems OMC; Force Protection Industries; General Dynamics Land Systems/BAE Systems; General Purpose Vehicles LLC; Navistar Defense; Protected Vehicles, Inc.; and Textron Marine & Land Cadillac Gage.

122.    By 2009, the Government decided to expand the deployment of MRAPs from Iraq to Afghanistan. This necessitated modifications to the MRAP vehicles. In Iraq, U.S. troops were fighting a largely urban insurgency on city streets. The MRAPs developed for this terrain were bulkier and had less mobility. By contrast, Afghanistan's insurgency was rural, and the MRAPs needed to be redesigned to be lighter and have better maneuverability, so that they would be adaptive to the rough and uneven terrain in Afghanistan.

123.    Rather than issuing a new overarching contract, the Government requested current MRAP Contract holders—including Navistar—to redesign their MRAP for use in Afghanistan.

124.    The response to the Government's request was the MRAP Independent Suspension System ("ISS") program, under which existing and new MRAP vehicles were to be outfitted with an ISS. An ISS allows each wheel on the same axle to move vertically and independently of the others, allowing for greater control. The ISS can be contrasted with a beam axle (or "rigid axle") system, in which the wheels of the vehicle are connected laterally by a beam or shaft. Original MRAP designs used a beam axle.

125.    Each of the contractors—again, including Navistar—redesigned their MRAPs for deployment in Afghanistan by outfitting with the vehicles with an ISS.

126.    From the end of 2009 until the MRAP contracts expired in 2012, the Government procured MRAPs that were designed for deployment in Afghanistan. Consequently, it ordered all contractors to retrofit the MRAPs the Government had previously purchased with ISSs, so as to render those vehicles fit for use in Afghanistan, and to provide MRAPs outfitted with ISSs on all new delivery orders. Hence, the Government purchased ISSs both in the form of upgrades to previously purchased vehicles, and as a component in newly completed MRAP vehicles.

127.    By October 2012, the Government had procured and fielded approximately 24,000

MRAP vehicles.

### 2. Navistar's MRAP Contract.

128.    On January 25, 2007, the Marine Corps System Command ("Marine Corps") in Quantico, Virginia awarded Navistar Defense Contract No. M67854-07-D-5032 (the "MRAP Contract"), a multi-year, firm-fixed price, indefinite delivery/indefinite quantity contract. *See* Exh. 5, at *1.

129.    Under the MRAP Contract, Navistar Defense supplied the Government with both Category I and Category II MRAP vehicles.

130.    Navistar Defense dubbed its MRAP vehicle series the "MaxxPro," for "maximum protection."

131.    Navistar Trucks, a subsidiary of Navistar International located in Garland, Texas, was responsible for assembling the various parts and shipping them to Navistar Defense, in West Point, Mississippi.

132.    Navistar Defense's obligation to comply with all applicable laws and regulations is explicitly provided for by the MRAP Contract, which states that "[t]he Contractor shall comply with, and shall ensure that its personnel and its subcontractor personnel at all tiers obey all existing and future U.S. . . . laws [and] Federal and DoD regulations . . ." *See* Exh. 5, at *466, *484.

133.    By the end of the contract's life cycle in 2012, the Government had procured approximately 9,000 MRAPs from Navistar Defense.

134.    Of these, 3,898 were outfitted with the ISS upgrade.

### B. NAVISTAR DEFENSE'S FRAUDULENT MISREPRESENTATIONS CONCERNING THE 7400 CHASSIS

135.    As set out in detail below, Defendant Navistar Defense knowingly made material misrepresentations concerning the cost and price of MRAP components to the Government in the

course of the negotiations leading up to the definitization of the terms of the MRAP Contract in 2008, during which the price for the MRAP vehicles was set. Specifically, Navistar Defense made misrepresentations concerning the price of the chassis used in MRAP vehicles, which caused the Government to pay a wildly inflated price for this component—approximately $250,000, as compared to the approximately $125,000 that Navistar Defense and other Navistar companies charged other customers. As the agreed-to price of the vehicles as a whole was based on the price of the individual components, *i.e.*, the line items on the MRAP Contract, the price of the vehicle was inflated correspondingly.

136.    The Government relied to its detriment on Navistar Defense's fraudulent misrepresentations in agreeing to the finalized terms of the MRAP Contract (including the price of the vehicles), and subsequently placing delivery orders ("DOs") under the MRAP Contract to purchase vehicles at the agreed-upon price. On information and belief, had the Government known the underlying costs of and profit margins on the components of the MRAP, the Government would neither have agreed to the price that was in fact agreed upon, nor placed the DOs that it placed with Navistar Defense under the MRAP Contract at the price agreed upon. In other words, Navistar Defense's fraudulent representations induced the Government to enter into the finalized MRAP contract and to place DOs for MRAP vehicles at inflated prices under that contract.

137.    Although Navistar Defense was granted a waiver for certified cost and pricing data after the negotiations in which the price of MRAP vehicles was finalized, the company (a) provided a modified waiver certifying the data over which it had control in order to receive the waiver, and (b) submitted a FAR 15-2 table and a separate and routine certification of its data with each modification and DO placed under the MRAP Contract, except for DO No. 23, the final DO under the MRAP contract.

31

138.    Because (a) the CO overseeing the MRAP contract was and remained under a standing obligation to ascertain price reasonableness under 48 C.F.R. § 15.402(a) for each DO, and (b) the CO could rely on all available data to make a price reasonableness determination, Navistar Defense's false representations concerning the cost and price of the components comprising the MRAP were false representations material to the Government's decision to pay the company, as "price is an unambiguously material condition under the FCA." *U.S. ex rel. Bierman v. Orthofix Int'l, N.V.*, 177 F. Supp. 3d 172, 715 (D. Mass. 2016 (citing *U.S. ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 51 (D.D.C. 2015)).

### 1.    Initial Contract Award and Definitization in Alpha Sessions.

139.    The MRAP contract was initially awarded to Navistar Defense on January 25, 2007. *See* Exh. 5, at *1. The MRAP Contract was originally awarded on the basis of "full and open competition." *See* Exh. 6, at *1. The Government consequently treated this award as one where there was "adequate price competition" within the meaning of 48 C.F.R. § 15.403-1(c)(1), and therefore considered the procurement as exempt from the requirement that the contractor (*i.e.*, Navistar Defense) provide certified cost and pricing data, pursuant to 48 C.F.R. § 15.403-1(b)(1). *See* Exh. 6, at *3.

140.    The Government and Navistar Defense engaged in so-called "Alpha Contracting Sessions" in March 2008 to definitize the terms of the MRAP Contract. *See* Exh. 6, at *1. "Alpha Contracting" refers to an expedited form of negotiations that was used for sole-source acquisitions, *i.e.*, contracts "for the purchase of supplies or services that is entered into or proposed to be entered into by an agency after soliciting and negotiating with only one source." 48 C.F.R. § 2.101. Sole-source acquisitions are by definition not "competitive" within the meaning of 48 C.F.R. § 15.403-1(c)(1).

141.    On behalf of Navistar Defense, negotiations were conducted by Archie Massicotte, President, Robert Walsh, Vice President and then-Director of Finance and later Chief Financial Officer Candace Tabor, and Director of Compliance, Pricing, and Contracts James Feller. Lynn Frazier of the U.S. Marine Corps and other Government officials conducted the negotiations on behalf of the Government. The Alpha Sessions took place in Quantico, Virginia.

142.    At the conclusion of the Alpha Sessions, the parties reached agreement on the price for all line items on the Consolidated Bill of Materials ("CBOM") of the MRAP vehicles, and ultimately settled on the following tiered pricing structure for the vehicles:

**Regular production**

Quantity 001 to 200:    $569,162
Quantity 201 to 4000:   $537,241

**Test vehicles**

Quantity 001 to 200:    $658,359

*See* Exh. 5, at *5.

143.    Because the MRAP acquisition had become sole-source due to the need for changes to Navistar's original MRAP platform and was therefore no longer "competitive" under 48 C.F.R. § 15.403-1(c)(1), the initial basis for not demanding that Navistar Defense provide certified cost or pricing data for the MRAP vehicles no longer applied after the Alpha Contracting Sessions. *See* Exh. 6, at *2. Consequently, the CO negotiating the MRAP contract was required to obtain certified cost or pricing data under 48 C.F.R. § 15.403-4(a), unless a different exception under 48 C.F.R. § 15.403-1(b) applied.

144.    Navistar Defense initially sought to convince the Government that the MRAP vehicle was a "commercial item" within the meaning of 48 C.F.R. § 2.101, so as to avoid having to produce certified cost or pricing data despite the sole-source nature of the acquisition.

145.    The Government did not find that the MaxxPro, Navistar's MRAP vehicle, was a

33

"commercial item." On information and belief, there is no evidence that MaxxPros were an item "of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes," nor is there evidence that MaxxPros have been "sold, leased, or licensed to the general public" or "offered for sale, lease, or license to the general public." 48 C.F.R. § 2.101.

146.    Navistar Defense remained committed to the goal of not having to produce certified cost or pricing data. After the Government did not find that the MRAP vehicle was a commercial item, Navistar Defense applied for a waiver of the certified cost or pricing data requirement (a "TINA waiver"), pursuant to 48 C.F.R. § 15.403-1(b)(4).

147.    TINA waivers are uncommon, and rarely granted. A DoD Guidance document from 2003 explains that TINA waivers are to be granted only in "exceptional case[s]," where (a) an item "cannot reasonably be obtained . . . without the grant of the waiver," (b) the price of the item "can be determined to be fair and reasonable without the submission of certified cost or pricing data" and (c) "there are demonstrated benefits to granting the waiver." Exh. 7.

148.    Navistar Defense represented to the Government that a TINA waiver was warranted for this procurement because (a) the company did not initially request cost data from its suppliers, because it was not required to do so prior to the Alpha Sessions, (b) as a manufacturer that had previously operated in the commercial sphere, it had no standing practice of requesting cost data from its suppliers, (c) if it would be required to obtain certified data at this stage, production of the MRAP would be significantly delayed, and (d) the company was willing to provide a modified certification, attesting that the data within Navistar Defense's control was "current, accurate, and complete." *See* Exh. 6, at *2–3.

149.    Navistar Defense submitted the "modified certification" that was contemplated in

the waiver application on May 1, 2008; it states that "to the best of its knowledge and belief, the information that [Navistar Defense] provided during Alpha negotiations regarding the work to be performed by [Navistar Defense] itself (and not by any subcontractor or supplier) was accurate, current and complete as of March 3, 2008." Exh. 8.

150.    Based on Navistar Defense's proffered justifications and the company's execution of the "modified certification" of the data within Navistar Defense's control, the Government granted the waiver on May 1, 2008. *See* Exh. 8.

151.    Despite having obtained a waiver, Navistar Defense employees prepared an overview of cost and pricing data in the form of a FAR 15-2 Table for each modification and DO placed under the MRAP Contract, except for the final DO, DO No. 23.

152.    Additionally, Navistar Defense employees executed certifications of the data provided in the FAR 15-2 Tables. In each instance, these certifications were signed by James Feller (Director of Compliance, Pricing and Contracts), Candace Tabor (Director of Finance and later Chief Financial Officer), Robert Walsh (Vice President), or Archie Massicotte (President).

153.    By contrast, Relator, upon joining Navistar Defense in 2009, consistently refused to sign the certifications of the cost and pricing data that was provided as part of the MRAP DOs. On at least one occasion when Relator refused to sign the TINA certification, his supervisor, James Feller, told Relator that he could easily replace Relator with someone who would agree to sign the TINA certifications Relator refused to sign.

154.    Linda DiToro, Relator's predecessor in the position of Director of Contracts, likewise refused to sign the certifications of cost and pricing data that accompanied the DOs under the MRAP Contract. Other Navistar Defense employees, including Tom High, Carl Ross-Works, and Mike Lyons, also refused to sign TINA certifications for MRAP DOs.

35

### 2.   Navistar Defense's False Representations Concerning the 7400 Chassis.

155.   In the Alpha Sessions, Navistar Defense had presented the Government with a complete bill of materials for its MRAP vehicle, the MaxxPro, and the price for the total vehicle that was agreed to at the conclusion of the negotiations was based on the price of the individual components of the vehicle, *i.e.*, the line items in the MRAP CBOM.

156.   Navistar Defense's design for the original MaxxPro MRAP vehicle incorporated Navistar's 7400 chassis, as did subsequent variants of the vehicle.

157.   Navistar Defense claimed that, because other Navistar companies sold 7400 chassis to the general public, the chassis was a "commercial item" under 48 C.F.R. § 2.101.

158.   The Government accepted Navistar Defense's position on the commercial item status of the 7400 chassis. The commercial item status exempted Navistar Defense from having to present certified cost or pricing data for the chassis. However, commercial item status did not exempt the Government officials who were negotiating the terms of the MRAP Contract from making a price reasonableness determination for the chassis. *See* 48 C.F.R. § 15.402(a) (making clear that price reasonableness determination must be made for every acquisition).

159.   The Government officials conducting the negotiations of the price of line items under the MRAP contract, including the chassis, in fact made a determination that the price the Government would be paying for the components of the MRAP, and therefore the vehicle as a whole, was "fair and reasonable." *See* Exh. 6, at *2.

160.   The price of the 7400 chassis on the MRAP bill of materials that was agreed to in the course of the Alpha Sessions—the price that the Government deemed "fair and reasonable"—was approximately $250,000 per unit.

161.   In making a price reasonableness determination for the 7400 chassis line item on

the MRAP contract in the Alpha Sessions, the Government officials making that determination relied on representations made by Navistar Defense employees concerning the commercial price of the chassis, *i.e.*, the price that Navistar Defense and/or other Navistar companies charged other customers for the chassis.

162.    The representations that Navistar Defense made to the Government to support a finding that a price of approximately $250,000 per chassis was "fair and reasonable" were false, because neither Navistar Defense nor any other Navistar company sold the chassis at a price of approximately $250,000.

163.    In the course of his normal job duties, Relator learned that while Navistar Defense charged the Government approximately $250,000 for the 7400 chassis under the MRAP contract, Navistar Defense priced the identical item at approximately $125,000 when selling it as part of other vehicles, under different contracts.

164.    Specifically, in or around April 2010, Relator examined DO No. 14 of the MRAP Contract. DO No. 14 was an order for 1,050 MRAP vehicles. Relator reviewed the FAR Table 15-2 that accompanied Navistar Defense's proposal, and noted that Navistar Defense charged the Government approximately $250,000 for the chassis when selling it as part of MRAP vehicles.

165.    In or around February 2012, in the normal course of his duties, Relator came across Internal Pricing Buildup documents for a different contract for a vehicle that also incorporated the 7400 Chassis. The contract in question was Contract No. W56HZV-08-D-G097, a contract with a different branch of the U.S. Military. Relator was the Contract Manager overseeing this contract on behalf of Navistar Defense.

166.    The document showed that the price of the 7400 chassis on the bill of materials for that vehicle was approximately $125,000. The total price of the vehicle in question was $136,618.

Around the same time, Relator also learned that the 7400 series chassis was priced at approximately $125,000 when sold to commercial customers and the military of foreign countries.

167.    When Relator asked Mary Gillie, Navistar Defense's Manager of Financing for the MRAP Contract, about the difference in price across contracts, Gillie confirmed that the chassis was priced differently on the MRAP Contract than it was priced on other contracts. She did not give Relator an explanation for the discrepancy.

168.    Relator also discussed his concerns with Navistar Defense employees James Feller, Candace Tabor, and Robert Walsh, and was told that Navistar Defense would not make any adjustments to the price of the chassis despite Relator's concerns.

169.    That same year, in the context of the negotiations for the ISS upgrade, Candace Tabor, in discussions with Relator and others, adamantly opposed producing cost data for Navistar Defense's ISS proposal to the Government. Ms. Tabor opposed producing this data because, given that the ISS was a modification to the 7400 chassis, disclosing costs for the ISS would have to involve disclosing the actual cost of the 7400 chassis, and therefore disclosing the excessive mark-up on this item. Ms. Tabor indicated that she feared that, if the Government found out the actual cost of the chassis, the Government would retroactively seek a rebate for Navistar Defense's excessive profits on all MRAP vehicles Navistar Defense had sold to the Government.

170.    Navistar Defense did not disclose to the Government in the 2008 Alpha Sessions that the price the company charged for the 7400 chassis under the MRAP Contract was at least twice the price it charged for this item when the item was incorporated in other vehicles.

171.    Navistar Defense knowingly made a false representation to the Government when the company asserted that the commercial price for the 7400 chassis was approximately $250,000, when in reality, the commercial price Navistar Defense (and other Navistar companies) charged

other customers for this item was approximately $125,000 or less.

172.   Navistar Defense's false representations about the purported commercial price of the 7400 chassis made in the course of the Alpha Sessions induced the Government into accepting the inflated price for this item and thereby into entering a contract that included a price of approximately $250,000 for the chassis. Had the Government known the price that Navistar Defense (and other Navistar companies) in fact charged other customers, *i.e.*, $125,000 per unit, the Government would not have entered into an agreement under which it paid Navistar Defense $250,000 per unit.

173.   Every claim submitted under a contract into which the Government was induced by fraud is an actionable false statement.

174.   Shortly after the Alpha Sessions, Navistar Defense made an express false certification when it certified that all the data within its control was "accurate, current and complete as of March 3, 2008." Exh. 8. This certification was false, because the company had presented false supporting documentation concerning the commercial price of the 7400 chassis, and had falsely presented that the commercial price of the 7400 chassis was approximately $250,000, when in reality, the commercial price of this item was approximately $125,000.

175.   Navistar's express false certification of the accuracy of the data presented in the Alpha Sessions was material to the Government's decision to place DOs and to pay Navistar Defense for the vehicles delivered under those DOs.

176.   Navistar Defense also made an express false certification every time it submitted its cost and pricing data for the MRAP vehicles, which it did with every response to a DO except for DO No. 23, the last DO under the Contract. Navistar Defense presented this data for DOs 1 through 22 in the form of a FAR 15-2 Table, with accompanying certification.

39

177.    Every MRAP sold to the Government incorporated the 7400 chassis, and therefore, every FAR 15-2 Table submitted included information on the price of the 7400 chassis. As detailed in the foregoing, the price for this item when included in the MRAP was approximately twice the price that Navistar Defense charged other customers, and therefore, the data provided was false.

178.    As evidenced by the certifications submitted, Navistar Defense understood that the company was under an obligation to provide data sufficient to permit the Government to make a price reasonableness determination. The company understood that the justifications proffered for the waiver in the Alpha Sessions in 2008 did not extend beyond the definitization of the terms of the initial MRAP Contract.

179.    Navistar Defense received 23 DOs under the MRAP contract, and submitted at least 23 invoices with 22 accompanying FAR 15-2 Tables certifying its cost and pricing data. Numerous tables included data for the 7400 chassis.

180.    These DOs included, among others, DO No. 7, placed on March 14, 2008. DO No. 7 was an order for 743 Category I MRAP vehicles with an initial value of $405.9 million. Navistar Defense's work under DO No. 7 was completed on May 31, 2010, by which time the Government had obligated a total of $675.8 million to Navistar Defense under this DO and any subsequent modifications to the order.

181.    As detailed in Part IV of this Complaint, a CO may rely on all data other than certified cost or pricing data in making a price reasonableness determination. The CO overseeing the MRAP Contract relied on the cost and pricing data provided by Navistar Defense along with each DO under the MRAP contract to determine whether the price the Government paid was "fair and reasonable." As price is "unambiguously material," the data provided by Navistar in the form of FAR 15-2 Tables was material to the Government's decision to pay Navistar the inflated prices

the company charged for the MRAP, and for the 7400 chassis in particular, irrespective of whether Navistar Defense was required to submit certified cost or pricing data concerning the chassis.

182.    Each false certification of cost and pricing data was an actionable false statement.

### 3. Damages to the Government Resulting from Navistar Defense's Fraudulent Misrepresentations Concerning the 7400 Chassis.

183.    As a result of Navistar Defense's fraudulent misrepresentations concerning the price of the 7400 chassis, the Government overpaid approximately $125,000 per MRAP vehicle incorporating the 7400 chassis.[14]

184.    The Government ordered approximately 9,000 MRAP vehicles that incorporated the 7400 chassis, and therefore suffered approximately $1,125,000,000 in single damages as a direct result of Navistar Defense's fraudulent misrepresentations concerning the 7400 chassis.

## C.  NAVISTAR DEFENSE'S FRAUDULENT MISREPRESENTATIONS CONCERNING THE MAXXFORCE D9.3I6 ENGINE

185.    Throughout the five-year life cycle of the MRAP Contract, Navistar Defense made numerous modifications to the vehicles it sold to the Government.

186.    The MRAP vehicles Navistar Defense sold to the Government from September 2008 onwards all incorporated the MaxxForce D9.3I6 engine. *See* Exh. 9. By contrast, the original MaxxPro vehicles incorporated the less powerful MaxxForce D8.7I6 engine. *See id.* Various subsequent versions of the MaxxPro—including the MaxxPro Dash Ambulance—also incorporate the MaxxForce D9.3I6 engine. However, the MaxxPro Recovery Vehicle, first produced in 2011, incorporates a different engine.

---

[14] Note that this is a conservative estimate, as it is based on the price Navistar Defense charged the Army for a vehicle that incorporated the 7400 chassis. Navistar Defense was likely also charging the Army more than its commercial customers, and the actual commercial price of the chassis may therefore well be considerably lower than this estimate.

187.    MaxxForce D9.3I6 engines are also incorporated into various other vehicles sold by Navistar companies, and Navistar Defense successfully convinced the Government that these engines are therefore a commercial item within the meaning of 48 C.F.R. § 2.101.

188.    While the commercial item determination for the engine meant that Navistar Defense was not required to submit certified cost or pricing data, the Government was nonetheless required to make a price reasonableness determination pursuant to 48 C.F.R. § 15.402(a). On information and belief, the Government in fact made a price reasonableness determination for this item.

189.    Navistar Defense priced MaxxForce D9.3I6 engines at approximately $27,000 to $34,000 per unit when it sold these engines to the Government as part of an MRAP vehicle. At or around the same time, Navistar companies sold MaxxForce D9.3I6 engines to other, non-Government customers at a price of $17,000 per unit. Hence, the true commercial price of the engines was $17,000, and the Government overpaid $10,000 to $17,000 per vehicle.

190.    As detailed below, Navistar Defense made false representations to induce the Government to purchase MRAP vehicles incorporating the MaxxForce D9.3I6 engine at inflated prices. These false representations include forged sales histories of the MaxxForce D9.3I6 engine. Navistar Defense's material misrepresentations concerning the MaxxForce D9.3I6 engine caused the Government to suffer single damages in excess of $36 million.

### 1.   Navistar Defense's False Representations Concerning the MaxxForce D9.3I6 Engine.

191.    The price for the MaxxForce D9.3I6 engine as a line item on the CBOM for MRAP vehicles produced by Navistar from 2008 onwards ranged from approximately $27,000 to approximately $34,000.

192.    The price for the MaxxForce D9.3I6 when incorporated into vehicles purchased by

non-Government customers throughout this period was approximately $17,000.

193.    The MaxxForce D9.3I6 engine was deemed to be a "commercial item," and Navistar Defense thus was not required to submit certified cost or pricing data to support the price it charged the Government for this item.

194.    However, the CO overseeing the MRAP Contract remained under an obligation to make a price reasonableness determination for this line item pursuant to 48 C.F.R. § 15.402(a), and Navistar Defense therefore was under an obligation to produce data sufficient to make a determination.

195.    To support the alleged commercial price of $27,000 to $34,000 per engine, Navistar Defense provided the Government with copies of purported invoices for sales of trucks by other Navistar companies incorporating the exact same engine. Specifically, the invoices in question purported to show the sale of a fleet of medium duty trucks by a commercial Navistar dealer in Illinois to a landscaping company.

196.    In 2011 or 2012, Mike Lyons (then Manager of Government Contracts at Navistar Defense), in the normal course of his duties, reviewed the CBOM for an MRAP DO, and noted that the price for the MaxxForce D9.3I6 engine on the MRAP CBOM ranged from approximately $27,000 to $34,000.

197.    Due to his familiarity with other Navistar contracts, Mr. Lyons knew that Navistar companies charged other, non-Government customers approximately $17,000 per engine.

198.    Puzzled by the price for the engine on the MRAP CBOM, Mr. Lyons asked for copies of invoices or other documentation that supported the purported commercial price that Navistar Defense was charging the Government for the MaxxForce D9.3I6 engine under the MRAP Contract.

43

199.    Mr. Lyons received and reviewed copies of invoices that purported to show the sale of a fleet of medium duty trucks incorporating the MaxxForce D9.3I6 engine to a landscaping business.

200.    These invoices also reflected that this landscaping company had purchased various replacement parts, including engines, transmissions, and suspensions.

201.    The invoices reviewed by Mr. Lyons were part of the proposal package that had been submitted to the Government.

202.    After receiving the invoices, Mr. Lyons contacted the landscaping company to verify these alleged sales.

203.    Upon being contacted by Mr. Lyons, the landscaping company relayed that it had only purchased one single truck, not an entire fleet. The company further relayed that it had not purchased the other items reflected on the invoices Mr. Lyons had reviewed, *i.e.*, the spare engines, suspensions, and transmissions. Thus, Mr. Lyons realized that the invoices were forgeries.

204.    Navistar Defense had presented the very same forged invoices to the Government to support its alleged "commercial price" of approximately $27,000 to $34,000 for the MaxxForce D9.3I6 engine. In reality, as Mr. Lyons knew, the commercial price of the engine—*i.e.*, the price Navistar companies charged other, non-Government customers—was approximately $17,000.

205.    Mr. Lyons asked Michael Cavanaugh, Pricing Manager, and Candace Tabor, who served as Finance Director until her promotion to Chief Financial Officer in 2011, about the forged invoices. Both indicated that the invoices had been prepared and submitted under the direction and/or authorization of Navistar Defense's senior leadership, including Vice President Robert Walsh and/or President Archie Massicotte.

206.    When Mr. Lyons subsequently confronted Mr. Walsh about the invoices, Mr.

Walsh angrily ordered Mr. Lyons to stop investigating the issue, or risk his position. Mr. Walsh accused Mr. Lyons of being "more loyal to the customer [i.e., the Government] than to the company."

207.    On information and belief, Navistar's forged documents induced the Government into a contract under which it paid approximately $27,000 to $34,000 per MaxxForce D9.3I6 engine.

208.    On information and belief, had the Government known that the documents Navistar Defense had presented to support its proposed price for the MaxxForce D9.3I6 engine were forged, the Government would not have entered into a contract under which it purchased MaxxForce D9.3I6 engines at a price of approximately $27,000 to $34,000 per unit.

209.    Price is "unambiguously material," and Navistar Defense's false representations—which took the form of forged documents purporting to show a sales history at the inflated price that Navistar charged the Government—were therefore material to the Government's decision to enter into a contract with Navistar Defense that incorporated a price of approximately $27,000 to $34,000 per engine, and to place DOs for vehicles under that contract.

210.    Every claim submitted under a contract into which the Government was induced by fraud is an actionable false statement.

211.    Navistar Defense made additional false representations when, in response to the DOs placed for MRAP vehicles incorporating the MaxxForce D9.3I6 engine, it provided a FAR 15-2 Table with price information for this item, and in certifying the price of the engine line item. Navistar Defense's certifications of the price of the MaxxForce D9.3I6 engine were false, because the purported "commercial price" of the engine was not $27,000 to $34,000, but instead $17,000 per unit.

212.    Navistar Defense's express false certifications of its cost and pricing data were material to the Government's decision to pay Navistar Defense for the claims for payment the company submitted to the Government when presenting the 15-2 Tables and certifications.

213.    Navistar Defense received a total of 23 DOs under the MRAP contract, and submitted at least 23 invoices with 22 accompanying FAR 15-2 Tables certifying its cost and pricing data. Numerous 15-2 Tables included data for the MaxxForce D9.3I6 engines.

214.    These DOs included, among others, DO No. 7, placed on March 14, 2008. As alleged above, DO No. 7 was an order for 743 Category I MRAP vehicles with an initial value of $405.9 million. Navistar Defense's work under DO No. 7 was completed on May 31, 2010, by which time the Government had obligated a total of $675.8 million to Navistar Defense under this DO and any subsequent modifications to the order.

215.    Each false certification of cost and pricing data was an actionable false statement.

### 2. Damages to the Government Resulting from Navistar Defense's Fraudulent Misrepresentations Concerning the MaxxForce D9.3I6 Engine.

216.    As a result of Navistar Defense's fraudulent misrepresentations concerning the price of the MaxxForce D9.3I6 engines, the Government overpaid approximately $10,000 to $17,000 per MRAP vehicle that incorporated these engines, or, on average, $13,500 per vehicle.

217.    On information and belief, the Government ordered at least 2,697 MRAP vehicles that incorporated the MaxxForce D9.3I6 engine, and, based on the average overpayment for the engine, therefore suffered approximately $36,409,500 in single damages as a direct result of Navistar Defense's fraudulent misrepresentations concerning the engine.

### D.  NAVISTAR DEFENSE'S FRAUDULENT MISREPRESENTATIONS IN CONNECTION WITH THE ISS UPGRADE

218.    Another modification to Navistar Defense's MRAP vehicles from the original

design was the Independent Suspension System, which would replace the beam axle system that had been used in Navistar Defense's MRAP vehicles up to that point.

219.    Navistar Defense employees started working on putting together a proposal for the ISS kits, which would be installed on already-purchased MRAPs and become part of newly purchased vehicles, in or around the fall of 2009.

220.    As detailed below, Navistar Defense was concerned that as part of the ISS upgrade, which involved a modification to the 7400 chassis, the Government would seek cost data from the company. Because this would reveal the excessive mark-up on the chassis, Navistar Defense employees, including Relator, were directed to ensure that the Government would not get access to cost data.

221.    The Government and Navistar Defense met for face-to-face negotiations on January 20, 2010. Navistar Defense was represented in this meeting by Relator, Mike Lyons (Manager of Government Contracts), Tom Meadows (Manager of Compliance), Candace Tabor (Director of Finance and later Chief Financial Officer), and Michael Cavanaugh (Pricing Manager, Parts), among others. The Government was represented in the meeting by Dennis Alber, the CO overseeing the negotiations of the ISS upgrade, among others.

222.    The next day, January 21, 2010, Navistar Defense proposed a per-unit price of $143,294 for the ISS kits.

223.    After several months of continued communications between the Government and Navistar Defense, Navistar Defense lowered the price to $142,602 in March 2010. *See* Exh. 10. The Government accepted this proposed price that same month.

224.    As set out in detail below, in agreeing to the price of $142,602 per ISS kit, the Government relied on false and misleading representations made by Navistar Defense's employees

47

in the course of the negotiations of the ISS upgrade. These false and misleading representations included fabricated invoices, fabricated sales histories, catalogue listings for parts Navistar companies had never sold, and intentionally misleading and inflated vendor quotes.

225.    On information and belief, had the Government known of the false and misleading representations Navistar Defense made in the course of the negotiations of the price of the ISS upgrade, the Government would not have entered into an agreement with Navistar Defense to purchase ISS kits at the price of $142,602 per unit. As price is "unambiguously material," Navistar Defense's false and misleading representations were material to the Government's decision to enter into this agreement, and to place DOs under it.

### 1. Navistar Defense's Efforts to Hide Cost Data During the Preparation of the ISS Proposal.

226.    During the fall of 2009, while Navistar Defense was developing its proposal for the ISS upgrade, the Government sought supporting cost data from Navistar Defense. Internally, the employees staffed on the MRAP, including Relator, discussed this request on multiple occasions.

227.    Relator and other members of the MRAP team repeatedly advised Candace Tabor, then Director of Finance and later Chief Financial Officer, Robert Walsh, Vice President, and others that Navistar Defense was obligated to provide this information.

228.    As alleged above, Candace Tabor adamantly opposed producing cost data for the ISS proposal to the Government, because doing so would involve disclosing the actual cost of the 7400 chassis, as the ISS upgrade was a modification to the 7400 chassis. Ms. Tabor indicated that she feared that, if the Government found out the actual cost of the chassis, the Government would retroactively seek a rebate on all MRAP vehicles Navistar Defense had sold to the Government.

229.    At the time these discussions took place, Relator did not know how much the price of the 7400 chassis had been inflated under the MRAP contract, and he suggested that the proper

way to proceed would be to provide the cost data along with an add-delete analysis, to rectify the overcharge to the Government.

230.    Ms. Tabor and Mr. Feller rejected Relator's suggestion, and made clear that they intended to hide the actual cost and the true commercial price of the 7400 chassis from the Government. Specifically, Ms. Tabor, who had limited federal contracting experience, repeatedly stated that the company would not reveal the cost of the 7400 chassis.

231.    To ensure that the Government would not get access to accurate cost and pricing data, Ms. Tabor and Mr. Feller proposed advancing the position that the ISS was a "commercial item." In response, Relator explained that the ISS did not meet the definition of "commercial item" set forth in 48 C.F.R. § 2.101.

232.    Mr. Feller, who had extensive experience in Government contracts, understood that the ISS did not meet the definition of "commercial item," but nonetheless embraced Ms. Tabor's position.

233.    The MRAP team was subsequently instructed to assert commerciality for the ISS, and convince the Government that the price for the ISS kits was "fair and reasonable," while at the same time hiding the actual cost of the 7400 chassis. The goal was to protect the excessive profits Navistar Defense had reaped from the sale of MRAP vehicles to the Government, and to continue to earn excessive profits from the sale of additional vehicles and ISS kits.

**2.    Navistar Defense's False Representations Concerning the ISS Kit.**

234.    Navistar Defense's proposal, as presented to the Government in March 2010, puts forth a per-unit price of $142,602 per ISS kit. *See* Exh. 10.

235.    The per-unit price of $142,602 was presented as having been arrived at by, first, adding up all of Navistar Defense's costs, detailed in the CBOM for the ISS, second, adding 2.71%

49

general and administrative costs ("G&A") over all items and 16.3% profit over non-commercial

line items, and, third, applying a top-line, across-the-board discount (referred to as a "decrement")

of 9.44% to the total figure for the 1,222 kits that the Government sought to purchase at that time.

*See* Exh. 10.[15]

236.    The CBOM for the ISS kit includes the following 13 parts, with the following

associated prices:

| Part number | Part Name | Price |
|---|---|---|
| 3862362C91 | Rear Axle/Suspension Module | $45,778 |
| 3862361C91 | Front Axle/Suspension Module | $44,945 |
| 3863347C91 | Case, Transfer, Fabco | $17,895 |
| 3862350C91 | Wheel, Disc | $3,443 |
| 3862275C91 | Gear, ASM Steering, Main | $1,221 |
| 3716055C9 | Module Central Tire Inflation System (CTIS) | $1,154 |
| 3862276C91 | Gear, ASM Steering, Slave | $704 |
| 3863875C91 | Prop #3 Transfer Case to Front axle w/Carc Paint | $544 |
| 3865021C91 | Support assy, fss rear tire nozzle | $405 |
| 3865022C91 | Support assy, fss rear tire nozzle | $405 |
| 3862281C91 | Shift Steering Immediate | $187 |
| 3862278C1 | Pittman Arm RS | $176 |
| 3862277C1 | Pittman Arm LS | $176 |

**Table 1** *Navistar Defense's Proposed Prices*.

237.    The CBOM identifies these 13 parts of the ISS kit as having been "commercially

priced." Exh. 10.

238.    To support the prices listed for these items on the CBOM, and induce the

Government to find that the prices charged were "fair and reasonable," Navistar Defense presented

the Government with purported sales histories, catalogue listings, and vendor quotes for the parts

in question, or for parts the company claimed were adequate comparators for these parts. These

---

[15] The proposal presents the decrement as a dollar value rather than a percentage. The decrement
value ($18,175,372) represents 9.44% of the pre-discounted proposal cost ($192,435,286). *See id.*

documents were either forged or utterly misleading.

239.    Specifically, Navistar Defense presented purported sales histories for a transfer case shaft, which Navistar Defense presented as proper comparators for Part No. 3863347C91, to support its proposed price of $17,895 for Part No. 3863347C91. In reality, the screenshots of purported sales of this transfer case shaft to commercial customers (including Deutsch's Truck and Diesel Repair) that Navistar Defense presented to the Government were forgeries. Navistar companies had not in fact sold the transfer case shaft to Deutsch's. The fabricated invoices therefore provided no evidence whatsoever that the price Navistar Defense charged the Government for Part No. 3863347C91 was the "commercial price" of this component.

240.    Navistar Defense also presented catalogue listing prices for Part No. 3863347C91 to support its proposed price of $17,895 for this component of the ISS. In reality, Navistar companies had never sold Part No. 3863347C91, and its fabricated listing thus provided no evidence that the price Navistar Defense charged the Government for Part No. 3863347C91 was the "commercial price" of this component.

241.    Furthermore, Navistar Defense presented the Government with purported vendor quotes for the front and rear axles of the ISS, to support its proposed price of $90,722 per set of axles. The vendor quotes presented by Navistar listed a set price of $103,904 for Hendrickson, the vendor selected by Navistar. *See* Exh. 11.

242.    In reality, the quote Hendrickson had provided to Navistar Defense was $58,480 per set.

243.    The lowest price quoted to Navistar Defense by a vendor was $50,166 per set.

244.    The document containing purported vendor quotes does not disclose Navistar Defense's mark-up (which ranges from 66% to 77% per set) on the quotes Navistar Defense had

received from prospective vendors. Although the document observes in a footnote that "[t]he same price factors were applied to all supplier quotes for a fair and reasonable price comparison," the undisclosed mark-up in fact makes a price reasonableness determination by the Government impossible, because the document hides the true commercial price of independent suspension axles—a price that ranges from $50,166 to $71,900 per set.

245.    The document Navistar Defense presented to support its proposed price for the axles is plainly and intentionally misleading, as it induces and was intended to induce the Government to believe that the commercial price per set ranges from $83,275 to $119,354, and that the Government is therefore getting a "good deal" at the proposed price of $90,722 per set. In reality, Navistar Defense charged the Government a price no commercial customer had paid or would pay for an axle set.

246.    Navistar Defense made similar fraudulent and highly misleading representations concerning other parts that were included in the ISS CBOM.

247.    On information and belief, the false representations about cost and price made by Navistar Defense—including the forged sales histories, fabricated listings, and inflated vendor quotes—induced the Government into an agreement under which it paid Navistar Defense $142,602 per ISS kit, and into placing additional DOs for ISS kits at the same price.

248.    On information and belief, had the Government known of Navistar Defense's fraudulent misrepresentations, the Government would not have entered into an agreement to pay $142,602 per ISS kit. Given that price is "unambiguously material," Navistar Defense's fraudulent misrepresentations, which induced the Government into entering into this agreement, were therefore material to the Government's decision to pay Navistar Defense for the ISS kits at the price of $142,602 per unit.

249.    Every claim submitted under a contract into which the Government was induced by fraud is an actionable false statement.

### 3. Navistar Defense Presented Express False Certifications of its Cost and Pricing Data, Which Were Material to the Government's Decision to Pay.

250.    Navistar Defense not only fraudulently induced the Government into entering into an agreement under which the Government paid Navistar $142,602 per ISS kit, but also made express false certifications in seeking payment for the ISS kits.

251.    Navistar Defense's proposal, as presented to the Government in March 2010, states that it "reflects our estimates and our/or actual costs . . . and conforms with the instructions in FAR 15.403-5(b)(1) and Table 15-2." Exh. 10. The ISS proposal further states that it "is consistent with our estimating and accounting practices and FAR Part 31, Cost Principles."

252.    FAR 15.403-5(b)(1) specifies the format for submission of certified cost or pricing data, and provides that, "[w]hen certification is required, the contracting officer may require submission of certified cost or pricing data in the format indicated in Table 15-2." 48 C.F.R. § 15.403-5(b)(1). As alleged above, a FAR 15-2 Table is the standard format for submitting certified cost or pricing data.

253.    In making these certifications, and presenting the FAR 15-2 table, Navistar Defense made an express false certification of compliance with FAR Part 15 and FAR Part 31, as the data in the proposal did not in fact reflect Navistar Defense's actual costs, as detailed in the foregoing.

254.    The statements included in Navistar Defense's proposal, along with the 15-2 Table that was included in the proposal, make clear that the Navistar Defense employees involved in developing the ISS proposal operated on the understanding that the company would be required to submit certified cost or pricing data for the ISS kits under 48 C.F.R. § 15.403-4, which mandates submission of certified data if none of the exceptions enumerated in 48 C.F.R. § 15.403-1(b)

applies. In other words, Navistar Defense employees understood that the TINA waiver—which had been granted at the conclusion of the Alpha Sessions, as discussed in ¶¶ 146–150 above—did not cover the ISS upgrade to the MRAP vehicles.

255.    The ISS was not only outside the scope of the TINA waiver that had been granted for the initial acquisition, and therefore not covered by 48 C.F.R. § 15.403-1(b)(4), it was also not a competitive acquisition, and therefore not covered by 48 C.F.R. § 15.403-1(b)(1).

256.    Although communications from Navistar Defense to the Government about the ISS kits state that Navistar Defense had a "sincere desire to be both fair and competitive" and therefore took into account "what the greater market for such components is paying," the Government was only able to procure ISS kits from other MRAP vendors for vehicles it had procured from those vendors. The Government made no attempt to source ISS kits for Navistar Defense's MaxxPro MRAP vehicles. On information and belief, there is no record of any attempt to procure ISS kits for MaxxPro vehicles from vendors other than Navistar Defense.

257.    The ISS kits were therefore a sole-source acquisition under 48 C.F.R. § 2.101, which defines a sole-source acquisition as a contract "for the purchase of supplies or services that is entered into or proposed to be entered into by an agency after soliciting and negotiating with only one source." As noted above, sole-source acquisitions are by definition not "competitive" within the meaning of 48 C.F.R. § 15.403-1(c)(1).

258.    As alleged above, Navistar Defense then sought to convince the Government that the ISS kits were a "commercial item" under 48 C.F.R. § 2.101.

259.    As alleged above, to qualify as a commercial item under 48 C.F.R. § 2.101, an item must be "of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes," and the contractor must either have "sold, leased, or

licensed [the item] to the general public," or have offered the item "for sale, lease, or license to the general public."

260.     When it presented its ISS kit proposal to the Government, Navistar companies had neither sold, leased, nor licensed ISS kits to the general public, nor offered ISS kits for sale, lease, nor license to the general public. Indeed, Navistar Defense acknowledged as much in the January 20, 2010 negotiations with the Government.

261.     Furthermore, by Navistar Defense's own admission, the ISS was not developed purely from other commercial items. Exh. 10 (listing both commercial and non-commercial items on the CBOM).

262.     Therefore, the ISS was plainly not a "commercial item" under 48 C.F.R. § 2.101.

263.     On information and belief, the CO overseeing the procurement of the ISS upgrade, Dennis Alber, never made a commercial item determination for the ISS kit, as required by DFARS 201.104.

264.     Because the ISS was not covered by the waiver, and was not a commercial item, and as there was no other basis on which Navistar Defense could be exempted from the requirement to provide certified cost or pricing data, Navistar Defense was in fact required to provide such data under 48 C.F.R. § 15.403-4.

265.     As alleged above, Navistar Defense presented cost and pricing data, and certified that data, when it presented its proposal for the ISS kit. In addition, Navistar Defense submitted numerous invoices with accompanying FAR 15-2 Tables certifying its cost and pricing data— including data for the ISS kits.

266.     Among these was a modification DO No. 14, which was placed on February 12, 2010. DO No. 14 was an order for 1,050 MRAP vehicles incorporating the ISS upgrade. DO No.

14 had an initial value of $751.5 million. Navistar Defense's work under DO No. 14 was completed on September 31, 2011, by which time the Government had obligated a total of $760.1 million to Navistar Defense under this DO and any subsequent modifications to the order.

267.    Each false certification of cost and pricing data was an actionable false statement.

268.    Even if—contrary to the foregoing—Navistar Defense was not required to provide certified cost or pricing data, the company was still required to provide data sufficient to permit the CO to make a price reasonableness determination, as required by 48 C.F.R. § 15.402(a). And, as alleged above, a CO is permitted to rely on the data provided by Navistar Defense to make a price reasonableness determination, irrespective of whether the items procured are commercial or non-commercial.

269.    And, irrespective of whether Navistar Defense was required to provide certified cost and pricing data, Navistar Defense in fact certified the data it provided in its proposal, and in the FAR 15-2 Tables the company submitted on all subsequent orders except for DO 23. Therefore, Navistar Defense made express false certifications in seeking payment from the Government for the ISS kits.

270.    Furthermore, irrespective of whether the ISS kit or any of its components were in fact commercial items, CO Dennis Alber was required to make a price reasonableness determination, and relied on the information and documentation provided by Navistar Defense in making that determination—including the forged, fraudulent, and misleading documents detailed in the foregoing. Given that price is "unambiguously material," Navistar Defense's false certifications were therefore material to the Government's decision to pay.

### 4. Damages to the Government Resulting from Navistar Defense's Fraudulent Misrepresentations Concerning the ISS Upgrade.

271.    Navistar Defense's fraudulent misrepresentations led the Government to accept

wildly inflated prices for the ISS kits. As set out in detail below, Navistar Defense overcharged the Government $30,455 per ISS kit.

272.     Navistar Defense sold 3,898 ISS kits to the Government under the MRAP Contract. The total single damages to the Government as a result of Navistar Defense's fraudulent misrepresentations with respect to the ISS kits is, therefore, $118,712,837.

273.     As alleged above, Navistar Defense presented the Government the following prices for the 13 parts discussed in the foregoing in the CBOM for the ISS kits:

| Part number | Part Name | Price |
| --- | --- | --- |
| 3862362C91 | Rear Axle/Suspension Module | $45,778 |
| 3862361C91 | Front Axle/Suspension Module | $44,945 |
| 3863347C91 | Case, Transfer, Fabco | $17,895 |
| 3862350C91 | Wheel, Disc | $3,443 |
| 3862275C91 | Gear, ASM Steering, Main | $1,221 |
| 3716055C9 | Module Central Tire Inflation System (CTIS) | $1,154 |
| 3862276C91 | Gear, ASM Steering, Slave | $704 |
| 3863875C91 | Prop #3 Transfer Case to Front axle w/Carc Paint | $544 |
| 3865021C91 | Support assy, fss rear tire nozzle | $405 |
| 3865022C91 | Support assy, fss rear tire nozzle | $405 |
| 3862281C91 | Shift Steering Immediate | $187 |
| 3862278C1 | Pittman Arm RS | $176 |
| 3862277C1 | Pittman Arm LS | $176 |

**Table 1** *Navistar Defense's Proposed Prices*.

274.     Navistar Defense added 2.71% for G&A on top of the listed prices in its proposal, and then reduced the total price by 9.44% (a top-line discount referred to as the "decrement"). *See* Exh. 10. The resulting prices per part, applying both the G&A and the decrement proportionally across all line items on the ISS CBOM, are as follows:

| Part number | Part Name | Price |
|---|---|---|
| 3862362C91 | Rear Axle/Suspension Module | $42,578 |
| 3862361C91 | Front Axle/Suspension Module | $41,802 |
| 3863347C91 | Case, Transfer, Fabco | $16,644 |
| 3862350C91 | Wheel, Disc | $3,202 |
| 3862275C91 | Gear, ASM Steering, Main | $1,135 |
| 3716055C9 | Module Central Tire Inflation System (CTIS) | $1,073 |
| 3862276C91 | Gear, ASM Steering, Slave | $655 |
| 3863875C91 | Prop #3 Transfer Case to Front axle w/Carc Paint | $506 |
| 3865021C91 | Support assy, fss rear tire nozzle | $377 |
| 3865022C91 | Support assy, fss rear tire nozzle | $377 |
| 3862281C91 | Shift Steering Immediate | $174 |
| 3862278C1 | Pittman Arm RS | $164 |
| 3862277C1 | Pittman Arm LS | $164 |

**Table 2** *Navistar Defense's Proposed Prices (Accounting for G&A and Decrement).*

275.    Navistar Defense's proposed prices for the above-listed 13 parts were supported by forged, fraudulent, and misleading documents, which served to permit Navistar Defense to reap excessive profits from the ISS kits.

276.    Had Navistar Defense been an honest dealer, and limited its profits to the 16.3% that it had presented as its profit margin in the ISS proposal, its prices would have been considerably lower.

277.    Based on actual vendor quotes and internal price documents that the Government obtained from Navistar Defense after opening an investigation into Navistar Defense's fraud based on Relator's allegations, prices for the 13 parts at issue would look very different, as Table 3—which accounts for the 16.3% profit margin Navistar Defense claimed under its March 2010 proposal, as well as for 2.75% for Material and Handling ("M&H") costs and 2.71 for G&A—illustrates:

| Part number | Proposed Price (incl. G&A and decrement) | Vendor Prices | Vendor Prices (incl. M&H, G&A and profit) | Difference |
|---|---|---|---|---|
| 3862362C91 | $42,578 | $25,083 | $30,786 | $11,792 |
| 3862361C91 | $41,802 | $25,083 | $30,786 | $11,016 |
| 3863347C91 | $16,644 | $10,280 | $12,617 | $4,027 |
| 3862350C91 | $3,202 | $2,105 | $2,584 | $618 |
| 3862275C91 | $1,135 | $735 | $902 | $233 |
| 3716055C9 | $1,073 | $694 | $852 | $221 |
| 3862276C91 | $655 | $424 | $520 | $135 |
| 3863875C91 | $506 | $266 | $326 | $180 |
| 3865021C91 | $377 | $242 | $297 | $80 |
| 3865022C91 | $377 | $242 | $297 | $80 |
| 3862281C91 | $174 | $112 | $137 | $37 |
| 3862278C1 | $164 | $60 | $74 | $90 |
| 3862277C1 | $164 | $60 | $74 | $90 |

**Table 3** *Proposed Prices vs. Vendor Prices.*[16]

278.    One of these 13 parts—the wheel—was included four times in the ISS kit. *See* Exh. 10. All other parts were only included once.

279.    Based on Table 3, and taking the number of times the respective parts were included in the ISS kits into account, the total amount the Government overpaid per kit was $30,455.[17]

280.    The Government purchased 3,898 ISS kits from Navistar Defense, and thus

---

[16] The vendor prices listed in Table 3 are the lowest quotes Navistar Defense received for the respective parts, as based on the company's own records. Navistar Defense did not always select the vendor offering the part in question at the lowest price. Specifically, Navistar Defense did not select the lowest price for parts 3862362C91, 3862361C91, 3862278C1, and 3862277C1. The actual quoted prices from the vendors that Navistar Defense selected for these parts were, respectively, $29,240 for parts 3862362C91 and 3862361C91, and $106 for parts 3862278C1 and 3862277C1. Accounting for 2.75% M&H, 2.71% G&A, and 16.3% profit, the prices Navistar Defense would have charged for these parts had it been an honest dealer would have been, respectively, $35,889 for parts 3862362C91 and 3862361C91, and $130 for parts 3862278C1 and 3862277C1.

[17] Note, first, that if overpayments per unit are to be calculated on the basis of the quotes of the vendors Navistar Defense in fact selected, the total amount overpaid per ISS kit would be $20,137. For details, see note 16, *supra*. Second, rounding errors account for the small difference in the sum total of the difference in prices in Table 3 being $30,452, and the correct price difference in ¶ 271 and ¶ 279 of $30,455.

59

overpaid a total of $118,712,837 based on the company's fraudulent misrepresentations concerning these kits.

### E. TOTAL DAMAGES TO THE GOVERNMENT AS A RESULT OF NAVISTAR DEFENSE'S FRAUDULENT MISREPRESENTATIONS RELATING TO THE MRAP CONTRACT

281.    As detailed in ¶¶ 155–184 above, the Government overpaid a total of approximately $1,125,000,000 for approximately 9,000 MRAP vehicles that incorporated the 7400 chassis.[18]

282.    As detailed in ¶¶ 191–217 above, the Government overpaid a total of approximately $36,409,500 for 2,697 MRAP vehicles that incorporated a MaxxForce D9.3I6 engine.

283.    As detailed in ¶¶ 234–280 above, the Government overpaid a total of $118,712,837 for 3,898 ISS kits.

284.    The total single damages the Government suffered as a direct result of Navistar Defense's fraudulent misrepresentations throughout the Government's inducement into and dealings under the MRAP Contract are, therefore, approximately **$1.28 billion**.

285.    Under 31 U.S.C. § 3729(a)(1), the Government is entitled to three times the actual damages it has suffered as a result of actionable fraudulent conduct. Treble damages resulting from Navistar Defense's fraud in relation to the MRAP Contract are approximately **$3.84 billion**.

286.    This figure does not include damages resulting from overcharges on other parts of the MRAP, specifically, the transmissions and suspensions. As alleged above, the forged invoices Mr. Lyons uncovered in the MRAP contract file reflected not only sales of engines, but also of transmissions and suspensions. These forged invoices were used to support inflated prices for these components. The Government has been further damaged by the difference between the inflated

---

[18] Again, as noted in footnote 14 *supra*, this is a conservative estimate based on the price Navistar Defense charged a different Government customer. Non-Government commercial customers may well have paid even lower prices for vehicles incorporating the identical chassis.

price and the true commercial price that Navistar companies charged other customers for these components, in an amount to be determined after discovery.

287.    This figure also does not include the statutory penalties, which range from $11,181 to $22,363 per false claim submitted to the Government. 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

### F.  NAVISTAR DEFENSE'S C-SUITE WAS AWARE OF AND SUPPORTED THE COMPANY'S FRAUDULENT MISREPRESENTATIONS TO THE GOVERNMENT

288.    The fraudulent misrepresentations described herein—which include, on more than one occasion, the presentation of forged and fabricated documents to the Government—were made with the full knowledge and support of the c-suite executives of Navistar Defense.

289.    As alleged above, the Alpha Negotiation Sessions in 2008, during which Navistar Defense made false representations concerning the commercial price of the 7400 chassis, were attended by Navistar Defense President Archie Massicotte, Vice President Robert Walsh, and Navistar Defense Vice President and Chief Financial Officer Candace Tabor. All executives were therefore physically present in meetings during which false representations were made.

290.    Furthermore, as alleged above, several certifications that accompanied the FAR 15-2 Tables that Navistar Defense submitted to the Government, which certified cost and pricing data for goods provided under 22 of the 23 DOs under the MRAP Contract, were signed, respectively, by Navistar Defense's Director of Finance and later Chief Financial Officer Candace Tabor, Vice President Robert Walsh, and President Archie Massicotte.

291.    Pricing decisions were kept firmly in the hands of Navistar Defense's executive leadership. For example, Linda DiToro, who served as Director of Government Contracts from 2008 to 2009, was systematically excluded from pricing decisions by President Massicotte and Vice President Walsh.

292.     Various employees—including Relator, Director of Government Contracts DiToro, and Government Contracts Manager Michael Lyons—brought pricing discrepancies, the existence of forgeries submitted to the Government, and potential violations of Government regulations to the attention of Navistar Defense's executive leadership.

293.     Specifically, Ms. DiToro told James Feller, Director of Compliance, Pricing, and Contracts, that she was not comfortable signing TINA certifications for deliveries under the MRAP Contract, because she refused to "rubber stamp" Navistar Defense's cost and pricing data without seeing the underlying facts. Ms. DiToro also voiced her concerns about Navistar Defense's pricing practices to President Massicotte. Neither Mr. Feller nor Mr. Massicotte did anything to address Ms. DiToro's concerns. Instead, Mr. Massicotte reacted negatively, and excluded Ms. DiToro from social events to which the entire office was invited, including an end-of-the-year party at Mr. Massicotte's residence.

294.     Ms. DiToro quit her position with Navistar Defense after only one year, due to the failure of the company's executive leadership to address the pricing improprieties in Government contracts she had brought to their attention, and the company's retaliatory conduct towards her.

295.     Upon leaving her position at Navistar Defense, Ms. DiToro warned Relator about signing TINA certifications, and to be wary of Navistar Defense's practice of "pyramid pricing," *i.e.*, the practice of taking a profit at several stages in the production and assembly process of the vehicles Navistar sold the Government.[19] Ms. DiToro told Relator that he was a "young man" and should be concerned about the detrimental impact that signing defective TINA certifications would

---

[19] As alleged above, "pyramid pricing" occurred whenever Navistar companies (including Navistar Truck, in Garland, Texas) transferred components to the Navistar Defense facility in West Point, Mississippi "at price" (that is, including a mark-up), while representing that the transfer was "at cost" (that is, without a mark-up), so as to hide the true profit margin from the Government.

have on his future career.

296.    Michael Lyons, Manager of Government Contracts at Navistar Defense, raised concerns over both the commerciality determination of items sold to the Government and over the pricing practices of Navistar Defense with his supervisors, James Feller (Director of Compliance, Pricing, and Contracts) and Robert Walsh (Vice President) in or around 2011 or 2012. The concerns raised by Mr. Lyons included the forged invoices for vehicles incorporating the 7400 chassis, discussed in ¶¶ 196–205 above. Mr. Lyons raised similar concerns with Mary Gillie, Navistar Defense's Manager of Financing for the MRAP Contract, and with Relator.

297.    At or around the time that Mr. Lyons complained, Relator served as Director of Contracts at Navistar Defense. In this capacity, Relator supervised Mr. Lyons. In his conversations with Relator, Mr. Lyons was adamant that he had discovered several instances of questionable and even fraudulent pricing related to various procurement actions on the part of Navistar Defense, including the fact that forged documents had been submitted to the Government.

298.    Mr. Lyons voiced his concerns about fraudulent pricing actions both in private as well as over email and in face-to-face meetings with Relator, Candace Tabor, James Feller, Tom Meadows, Susan Licata, Mike Layman, and Robert Walsh. Relator himself reported Mr. Lyons' concerns to James Feller as well.

299.    Rather than addressing Mr. Lyons' concerns, Navistar Defense contemplated how to fire Mr. Lyons. On two occasions, Relator was directed by his direct supervisor, Mr. Feller, to travel to Detroit (where Mr. Lyons was based) to fire Mr. Lyons, for alleged insubordination and creation of a hostile work environment.

300.    Relator had asked his supervisors for permission to take a closer look at Mr. Lyons' claims. Instead of granting him permission to do so, Mr. Feller stated to Relator that Mr. Massicotte

"wanted [Mr. Lyons] gone." In response, Relator asked for a meeting with Mr. Feller, Mr. Meadows, Ms. Gillie, Mr. Cavanaugh, Ms. Tabor, and Gordon Wolverton, Program Manager. During this meeting, it became apparent that Navistar Defense's leadership feared that Mr. Lyons might become a whistleblower. At the end of this meeting, Relator's supervisors decided it would be better for Relator not to terminate Mr. Lyons.

301.    On a later occasion, Relator was again directed to go to Detroit to terminate Mr. Lyons. When Relator landed in Detroit, he received a call from Elizabeth Serrano, Navistar Defense's Human Resources Manager. Ms. Serrano instructed Relator to talk to Mr. Lyons about the emails Mr. Lyons had sent which included allegations of fraud, but told him not to fire Mr. Lyons, as this was deemed to be "too risky."

302.    Finally, Relator, both in his capacity as Contracts Manager and as Director of Contracts, brought his concerns over Navistar Defense's pricing practices to the attention of his supervisors, including Director of Compliance, Pricing, and Contracts James Feller, on several occasions. Like Ms. DiToro, Relator refused to sign TINA certifications for orders under the MRAP Contract. Relator's refusal to sign the TINA certifications upset Mr. Feller.

## VI.    COUNTS

### COUNT ONE

### 31 U.S.C. §3729(a)(1)(A) – PRESENTATION OF FALSE CLAIMS

#### (Against All Defendants)

303.    Plaintiff-Relator repeats and realleges each and every allegation contained herein.

304.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

305.    Through the acts described above, Defendants Navistar International and Navistar Defense and their agents and employees knowingly (as "knowingly" is defined by 31 U.S.C. §

3729(b)(1)) presented or caused to be presented material false or fraudulent claims for payment or approval to the United States.

306.    Navistar Defense submitted forged invoices and other fraudulent and misleading documents, and made false statements in order to receive the MRAP Contract award, finalize the price terms under that contract, and receive the award of DOs and modifications under that contract.

307.    By and through these actions, Navistar Defense hid the fact that the prices of its MRAP vehicles and the components of these vehicles was inflated for each and every delivery order placed and modification under the MRAP contract, making each response to a delivery order and modification a false claim.

308.    The United States was unaware of the falsity of the claims presented or caused to be presented by Defendants Navistar International and Navistar Defense and their agents and employees, and consequently approved, paid, and participated in payments that otherwise would not have been allowed.

309.    By reasons of these payments and approvals, the United States has been damaged to be damaged in an amount to be determined at trial.

**COUNT TWO**

**31 U.S.C. § 3729 (a)(1)(B) – MAKING OR USING A FALSE RECORD OR STATEMENT**
**(Against All Defendants)**

310.    Plaintiff-Relator repeats and realleges each and every allegation contained herein.

311.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

312.    Through the acts described above, Defendants Navistar International and Navistar Defense and their agents and employees knowingly (as "knowingly" is defined by 31 U.S.C. §

65

3729(b)(1)) made, used, and caused to be made and used material false records and statements to get false or fraudulent claims paid or approved by the Government.

313.    Navistar Defense submitted forged invoices and other fraudulent and misleading documents, and made false statements in order to receive the MRAP Contract award, finalize the terms of that contract, and receive the award of DOs and modifications under that contract.

314.    Navistar Defense provided cost and pricing data in FAR 15-2 Table format, and signed TINA Certifications to make the Government believe that the cost and pricing data it had provided was accurate and complete, and that the prices it charged the Government were fair and reasonable.

315.    Navistar Defense knew that the data it provided in its 15-2 tables were false and that the accompanying TINA Certifications were false, as the cost and pricing data contained in the tables was not accurate or complete.

316.    The United States, unaware of the falsity of the records, statements, and claims made and caused to be made by Defendants Navistar International and Navistar Defense and their agents and employees, paid Navistar Defense for claims that would not have been paid if the truth were known.

317.    By reasons of the false records, statements, and claims made and caused to be made by Defendants, the United States has been damaged in an amount to be determined at trial.

## COUNT THREE
### 31 U.S.C. §3729(a)(1)(A) & 31 U.S.C. § 3729 (a)(1)(B) – FRAUDULENT INDUCEMENT
### (Against All Defendants)

318.    Plaintiff-Relator repeats and realleges each and every allegation contained herein.

319.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq.

320.     Through the acts described above, Defendants Navistar International and Navistar Defense and their agents and employees knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false or fraudulent claims and knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, and caused to be made and used material false records and statements to fraudulently induce the United States to pay or approve Navistar's claims.

321.     Navistar Defense submitted forged invoices and other fraudulent and misleading documents, and made false statements in order to induce the Government to enter into the MRAP Contract, and to definitize the terms of that Contract.

322.     After being awarded the MRAP Contract and definitizing its terms, Navistar Defense submitted cost and pricing data and signed TINA Certifications to further induce the Government to award Navistar Defense DOs and modifications under the contract.

323.     All invoices submitted under the MRAP contract were false claims, because the contract itself, as well as all DOs and modifications under that contract, was induced by fraud.

324.     Navistar Defense knew that the Government was unaware of the forged documents that Navistar Defense had presented and the inflated prices the company charged for the MRAP vehicles and their components.

325.     The United States, unaware of the falsity of the claims made by Defendants Navistar International and Navistar Defense and their agents and employees, relied on the false statements, records, and presentment of claims, and approved, paid, and participated in payments that otherwise would not have been allowed.

326.     By reasons of these payments and approvals, the United States has been damaged in an amount to be determined at trial.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against Defendants as follows:

      a.      That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

      b.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. § 3729 proven at trial;

      c.      That Plaintiff-Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act, including the costs and expenses of this action and reasonable attorneys' fees; and

      d.      Such other, further, and different relief, whether preliminary or permanent, legal or equitable, as the Court deems just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated:  November 1, 2019                   Respectfully submitted:

H. Vincent McKnight

H. Vincent McKnight (D.C. Bar No. 293811)
Kevin Sharp (*Pro Hac Vice* forthcoming)
John McKnight (D.C. Bar No. 1031354)
Andrew Miller (D.C. Bar No. 1047209)
Robert Van Someren Greve (D.C. Bar No. 1617234)
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave SE, Suite 300
Washington, DC 20003
Tel:    (202) 499-5200
Fax:    (202) 449-5199
Email:  vmcknight@sanfordheisler.com
        ksharp@sanfordheisler.com
        jmcknight@sanfordheisler.com
        amiller@sanfordheisler.com
        rvansomerengreve@sanfordheisler.com

*Attorneys for Relator Duquoin Burgess*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Motion, Filed Under Seal, was sent by Federal
Express, postage prepaid, November 1, 2019 to:

Gary Newkirk
*Assistant United States Attorney*
Darrell Valdez
*Assistant United States Attorney*
555 4th Street, NW
Washington, DC 20530

*<u>s/ H. Vincent McKnight</u>*
H. Vincent McKnight
