## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. DUQUOIN BURGESS, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 13cv1463 (TSC) |
| | : | |
| v. | : | |
| | : | **COMPLAINT** |
| | : | **AND DEMAND FOR** |
| NAVISTAR DEFENSE, LLC, | : | **JURY TRIAL** |
| | : | |
| Defendant. | : | |

### UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION

The United States brings this action to recover treble damages and civil penalties pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, or, alternatively, to recover damages, restitution, and other monetary relief under the federal common law theories of fraud, payment by mistake and unjust enrichment.

### NATURE OF ACTION

1.      The causes of action asserted by the United States arise from false or fraudulent claims that Defendant Navistar Defense, LLC ("Navistar") submitted or caused to be submitted to the United States Marine Corps (USMC) to install an independent suspension system (ISS) on the Mine-Resistant Ambush Protected (MRAP) vehicle.

2.      From January 2007 to July 2012, Navistar, or its predecessor, International Military and Government, LLC (IMG), contracted with the USMC to produce thousands of MRAP vehicles for the USMC and other armed forces of the United States under Contract No. M67854-07-D-5032 (the "Contract").  In January 2010, the USMC Contracting Officer (CO) and Navistar entered into negotiations to establish a price for a contract modification, Contract Mod. No. 2, for an independent suspension system (ISS) for MRAP vehicles purchased under the Contract.  The prices established through those negotiations, which were inflated because of Navistar's false or fraudulent misrepresentations, were used to set prices for the ISS in every Contract delivery order that followed.

3.      To determine whether Navistar's proposed ISS price was fair and reasonable, the CO requested that Navistar provide proof of actual sales for 11 ISS parts.  Navistar responded to the CO's request by providing purported sales histories for 11 parts it claimed were "similar" to the ISS parts covered by the modification.  In so doing, Navistar represented that the prices others paid for the "similar" parts on the commercial market were comparable to the proposed price for Navistar's 11 ISS parts.  Navistar knew the sales histories it submitted to the CO to induce his agreement to its proposed price were false because the purported sales had never occurred.  The CO relied on the false sales histories Navistar submitted in agreeing to an inflated price for the ISS.

4.      As a result of Navistar's false or fraudulent statements and claims, Navistar knowingly submitted or caused to be submitted false or fraudulent invoices for payment to the United States for the MRAP ISS, and knowingly made false statements material to false or fraudulent claims that caused the USMC to pay for the MRAP ISS at an inflated price.

5.      Relator Duquoin Burgess filed this action on behalf of the United States and himself, pursuant to the qui tam provisions of the FCA, 31 U.S.C. § 3730(b)(1), on September 25, 2013. Pursuant to 31 U.S.C. § 3731(c), this Complaint in Partial Intervention relates back to the filing date of the relator's Complaint.

## PARTIES

6.      The United States of America is a plaintiff in this action. The United States brings this action on behalf of the USMC, an armed force of the United States. The Marine Corps Systems Command (MARCORSYSCOM), Quantico, Virginia, was at all relevant times the contracting agency for the USMC and the acquisition at issue. Individuals who work for the USMC and MARCORSYSCOM are employees of the United States government.

7.      Relator Duquoin Burgess is a former Navistar employee. Relator worked at Navistar from March 2009 until October 2012. During all times relevant, Relator served as Government Contracts Manager, responsible for negotiating and managing contracts with the United States, including the contract modifications at issue here.

8.     Navistar is a limited liability company incorporated under the laws of Delaware and has its principal place of business in Melrose Park, Illinois. Navistar manufactures military vehicles for the United States and other countries out of its manufacturing center in West Point, Mississippi and a distribution center in Springfield, Ohio.  Navistar maintains a network of dealerships throughout the United States and the world.  Navistar is a subsidiary of Navistar International, LLC, which has been in the business of manufacturing vehicles for the public since 1902.  Navistar International is a limited liability company incorporated under the laws of Delaware and has its principal place of business in Lisle, Illinois.  Navistar International has offices throughout the world, including Washington, D.C., Knoxville, Tennessee, Canada, the People's Republic of China and South Africa.

## JURISDICTION AND VENUE

9.     This action arises under the False Claims Act, 31 U.S.C. §§3729-33, and the common law.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3732(a) and 28 U.S.C. §§ 1331, and 1345.

11.    Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendant has transacted business in this District and has committed acts proscribed by 31 U.S.C. § 3729 in this District.

## THE FALSE CLAIMS ACT

12.     The FCA imposes liability for knowingly presenting false or fraudulent claims for payment to the United States Government, or knowingly using a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A); (a)(1)(B).  At all times relevant to the Complaint, the FCA provided, in pertinent part, that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or]

> (a)(1)(B) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim []
> …

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains[].[11]

13.     For purposes of these provisions, the terms "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(1)(B).

---

[11]     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per false claim for violations occurring from September 29, 1999, to November 2, 2015, and $10,781 to $21,563 per false claim for violations occurring after Nov. 2, 2015.

## FACTUAL ALLEGATIONS

### The MRAP Contract

14.    On January 25, 2007, the USMC awarded MRAP contracts to four competing Original Equipment Manufacturers (OEMs), including Navistar's predecessor, IMG.  The contracts called for the manufacture and purchase of the MRAP vehicles, which replaced the Humvee as the preferred armored personnel carrier during the wars in Iraq and Afghanistan.

15.    At all times relevant, the USMC had an urgent need to furnish MRAPs and MRAPS upgraded with the ISS to war fighters on the battlefield.

16.    Navistar, by and through its predecessor company, IMG, received an initial contract award to provide nearly 1,100 MRAP units under the Contract.

17.    After the initial contract awards to the four OEMs, the USMC awarded each OEM a number of delivery orders for additional MRAP units and also issued engineering change proposals, all on a sole-source basis pursuant to the government's authority to waive competition under 10 U.S.C. § 2304c(b)(3). Between 2007 and 2009, USMC contracted for nearly 3,000 more MRAP units and variants from Navistar.

18.    The CO was required to purchase the MRAPs at a fair and reasonable price.  FAR 15.402(a).

19.    In connection with Delivery Order 6, which did not involve the ISS, the USMC requested certified cost and pricing data from Navistar to ensure that prices negotiated for sole-source to that Delivery Order were fair and reasonable.

20.     On March 6, 2008, Navistar requested that the USMC waive the requirement for certified cost or pricing data requirements for Delivery Order No. 6. In its application for a waiver, Navistar asserted that a waiver was needed because its vendors and subcontractors were not accustomed to the rigorous internal accounting standards required when contracting with the government.

21.     Instead of certified cost and pricing data, Navistar agreed to provide "*other* than certified cost and pricing data" to allow the CO to assess whether Navistar's proposed prices were fair and reasonable, and to sign a "modified certification" attesting that the cost and pricing data "*within their control*" submitted to the USMC was "current, accurate, and complete."

22.     On May 1, 2008, the USMC granted Navistar's request to waive the requirement for certified cost and pricing data to support its proposed price. In the waiver, the USMC specifically noted that it granted the waiver because Navistar had agreed to provide ample *other* than certified cost or pricing data and to submit a modified certification.

23.     Under a subsection titled "Undefinitized Contract Actions":

> ***NOTE: For pricing analysis, and other than cost/pricing data, the contractor may be, at the Contracting Officer's request, required to submit the following:
>
> Quotes and Invoices from suppliers (showing material/purchase costs),
>
> Informal cost breakdowns,
>
> Price lists/catalogs,

Sales data to customers other than the Government,

Additional other than cost and pricing data as needed.

24.     At the completion of each and every modification negotiation under the Contract, Navistar certified that "the cost or pricing data (as defined in section 15.401 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted, either actually or by specific identification in writing, to the Contracting Officer . . . [was] accurate, complete, and current."

### The Independent Suspension System

25.     As the focus of the war effort shifted from the deserts in Iraq to more mountainous and rocky terrain common in Afghanistan, the United States required a more robust suspension system for the MRAP.  The USMC approached each MRAP OEM for a sole-sourced modification under their existing MRAP contracts for independent suspension upgrades on every MRAP vehicle purchased.

26.     In response to the USMC request for modifications, Navistar proposed an ISS solution for its own MRAP vehicle in December 2009.

27.     Price negotiations for Navistar's proposed ISS solution were conducted on January 20-21, 2010.  CO Dennis Alber led the negotiations for the USMC.

28.     The parties conducted the ISS negotiations on a part-by-part basis. Negotiations centered on prices for the 11 parts at issue and two axles, which comprised more than 80 percent of the total proposed price for the ISS.  The final unit price for the ISS was determined by adding individual prices for each part.

29.    Navistar's parent, Navistar International, supplied parts for the MRAP to Navistar, and maintained a network of authorized, independent parts dealers throughout the country that provided spare parts to public customers, large and small.

30.    For the MRAP, Navistar International manufactured a large truck chassis, or base, which included a frame, an engine, a transmission and a passenger cabin.  Navistar International purchased all other parts for the chassis from suppliers and assembled those parts to produce the original MRAP chassis. Navistar International transferred the completed MRAP chassis to Navistar Defense, which then incorporated additional, military-specific modifications, such as armor, as needed.

31.    Neither Navistar nor its parent company, Navistar International, manufactured the individual parts for the ISS, nor had they ever sold the ISS parts on the commercial market.

### The Corporate Part Lookup Invoices

32.    As the ISS negotiations set for January 20-21, 2010 approached, the CO requested that Navistar provide support for the price proposed for the ISS parts to establish the reasonableness of its proposed price.

33.    Navistar refused to disclose its supplier prices or other evidence of its actual costs for the ISS or the ISS parts to the CO.  Navistar argued that its ISS solution and the parts that comprised it were "commercial items" for which it was not required to provide certified cost and pricing data.  Navistar also cited the

waiver granted by the USMC.  Navistar provided supplier quotes and invoices for the ISS parts with all dollar amounts *redacted.*

34.    Instead, Navistar agreed to provide the CO with prior commercial sales histories of certain parts to establish its proposed price for the ISS was fair and reasonable.

35.    Because neither Navistar nor Navistar International had ever sold any of the new ISS parts, Navistar provided sales of similar parts, with the same form, fit, and function to demonstrate to the CO that the prices proposed for 11 of the ISS parts were fair and reasonable.

36.    On December 22, 2009, Navistar's Finance Director, Candace Tabor, sent an "urgent" email to a number of Navistar employees requesting assistance for the upcoming negotiations with the USMC.  Ms. Tabor indicated that Navistar was using "sales of these 'like' parts to demonstrate fair and reasonable price to pass DCAA audit and negotiations.".

37.    In preparation for the ISS negotiations, Navistar's Pricing Manager, Michael Cavanaugh, fabricated a document purporting to show sales information for each of the 11 ISS parts in the form of "Corporate Part Lookups" (CPLs) taken from Navistar International's "Fleetcharge" system, a proprietary software system for quoting and ordering parts through Navistar International and its nationwide network of parts dealers.

38.    The sales information was false, as the sales identified in the CPLs never occurred.

39.     Navistar submitted the false CPLs for 11 parts, each with a similar form, fit, or function to the 11 new ISS parts the USMC was going to purchase.

40.     The false CPLs purported to show a sale between an authorized Navistar International dealer and a customer, complete with an "Invoice Date," "Invoice Price," and "Billing Price."

41.     Michael Cavanaugh wrote a cover letter to accompany the false CPLs for the 11 similar ISS parts.  The cover letter described the false CPLs as documents showing "the sale of the exact item, or of a similar item that is same in form, fit or function.  The highlighted items [on the CPLs] indicate the part number, the Dealer name, description and the invoiced priced."

42.     During ISS negotiations on January 20-21, 2010, Navistar's negotiators presented the false CPL screenshots of "similar" parts to the CO to persuade the CO that the prices Navistar proposed for the 11 parts under negotiation were fair and reasonable.  Navistar employees explained to the CO that the prior sales prices of these "similar" parts were comparable to the prices proposed for the new ISS parts.

43.     Michael Cavanaugh and other Navistar employees knew that the false CPLs did not reflect actual sales and did not reflect a reasonable price.

44.     Navistar's proposed prices for the 11 ISS parts contained an undisclosed markup well over actual supplier quotes.  The following examples, based on information obtained from the original suppliers during the government's investigation and not available to the CO at the time of the ISS negotiations,

illustrate Navistar's undisclosed markup on the ISS parts:

- The Transfer Case, Part No. 3863347C91, was sold to the USMC for $17,895.  The supplier's quote was $10,280.
- The ASM Main Steering Gear, Part No. 3862275C91, was sold to the USMC for $1,221.  The supplier's quote was $735.
- The Intermediate Steering Shaft, Part No. 3862281C91, was sold to the USMC $187.  The supplier's quote was $112.

45.    The CO believed Navistar's representation that the false CPLs reflected actual sales for similar parts and relied on them in concluding that Navistar's proposed prices for each of the 11 ISS parts were fair and reasonable.

46.    Navistar's misrepresentations deprived the CO of truthful information necessary to effectively negotiate a fair and reasonable price, resulting in an agreed upon price for the ISS higher than it would have been if Navistar had not submitted the false CPLs.

47.    Navistar knew from prior experience that had it disclosed the fact that it had no prior sales of the same or similar parts, the CO would have demanded the un-redacted supplier quotes and would have negotiated a substantially lower price for the ISS and its parts.

48.    At the time of the ISS negotiations, Navistar employees knew that the CO would have "brought [Navistar] down to 15% [profit] for items where [Navistar] did not have a contract or sales invoice as backup."

12

49.     As a result of Navistar's knowing use of false or fraudulent CPLs as proof of actual sales at a particular price for the 11 similar ISS parts, Navistar fraudulently induced the CO to agree to inflated prices for the ISS above that which the CO would allowed had it provided true and accurate information.

### Navistar's Certification

50.     On March 4, 2010, after negotiations had been completed, Navistar's Finance Director Candace Tabor submitted to USMC a certification stating:

> This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 15.401 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative in support of ISS Dash Retrofit Kit are accurate, complete, and current as of [January 21, 2010].

51.     That certification was false because the CPLs were false.

52.     On or about March 18, 2010, the USMC awarded Contract Mod. No. 2 for the modified ISS at the negotiated price, and then issued a delivery order ("Delivery Order 13") to Navistar for an initial purchase of 1,222 ISS units at the negotiated price.

53.     The fabricated CPLs used to support the reasonableness of its prices for the 11 ISS parts established an inflated negotiated price for all ISS units purchased under Delivery Order 13, and for additional ISS units purchased in Delivery Orders 14 - 20 that followed.

54.     As a result of Navistar's false statements and certifications, USMC paid more for the ISS units than it would have paid if Navistar had truthfully

disclosed that it had not sold the parts similar to the ISS parts on the commercial market at the prices represented.

### ISS Delivery Orders and Invoices

55. The following table shows examples of government purchases of ISS units under the Contract where Navistar overcharged the government, submitting inflated invoices that the government paid:

| CONTRACT | DELIVERY ORDER | CLIN | INVOICE # | INVOICE REC DATE | INV QTY | VOUCHER # | VOUCHER DATE |
|---|---|---|---|---|---|---|---|
| M6785407D5032 | 13 | 3211 | FLT0001 | 3/30/2010 | 5 | E8627 | 05/06/2010 |
| M6785407D5032 | 13 | 3211 | FLT0002 | 3/30/2010 | 10 | E8627 | 05/06/2010 |
| M6785407D5032 | 13 | 3211 | FLT0003 | 3/30/2010 | 10 | E8627 | 05/06/2010 |
| M6785407D5032 | 13 | 3211 | FLT0004 | 3/30/2010 | 10 | E8627 | 05/06/2010 |
| M6785407D5032 | 13 | 3211 | FLT0005 | 3/30/2010 | 10 | E8627 | 05/06/2010 |
| M6785407D5032 | 13 | 3211 | FLT0006 | 3/30/2010 | 4 | E8627 | 05/06/2010 |
| M6785407D5032 | 13 | 3211 | FLT0007 | 3/31/2010 | 3 | E8627 | 05/06/2010 |
| M6785407D5032 | 13 | 3211 | KIT0001 | 6/11/2010 | 2 | E6135 | 07/12/2010 |
| M6785407D5032 | 13 | 3211 | KIT0002 | 6/11/2010 | 2 | E6135 | 07/12/2010 |
| M6785407D5032 | 13 | 3211 | KIT0003 | 6/11/2010 | 2 | E6135 | 07/12/2010 |

| CONTRACT | DELIVERY ORDER | CLIN | INVOICE # | INVOICE REC DATE | INV QTY | VOUCHER # | VOUCHER DATE |
|---|---|---|---|---|---|---|---|
| M6785407D5032 | 14 | 3209 | NTE0001 | 4/23/2010 | 19 | E4352 | 05/26/2010 |
| M6785407D5032 | 14 | 3209 | NTE0002 | 4/28/2010 | 67 | E4352 | 05/26/2010 |
| M6785407D5032 | 14 | 3209 | NTE0003 | 4/28/2010 | 17 | E4352 | 05/26/2010 |
| M6785407D5032 | 14 | 3209 | NTE0004 | 4/30/2010 | 32 | E0848 | 06/18/2010 |
| M6785407D5032 | 14 | 3209 | NTE0005 | 6/10/2010 | 33 | E6136 | 07/12/2010 |
| M6785407D5032 | 14 | 3209 | NTE0006 | 6/10/2010 | 12 | E6136 | 07/12/2010 |
| M6785407D5032 | 14 | 3209 | NTE0007 | 6/14/2010 | 48 | E6136 | 07/12/2010 |
| M6785407D5032 | 14 | 3209 | NTE0008 | 6/15/2010 | 33 | E9677 | 07/23/2010 |
| M6785407D5032 | 14 | 3209 | NTE0009 | 6/16/2010 | 29 | E0307 | 07/26/2010 |
| M6785407D5032 | 14 | 3209 | NTE0010 | 6/17/2010 | 10 | E0738 | 07/27/2010 |

| CONTRACT | DELIVERY ORDER | CLIN | INVOICE # | INVOICE REC DATE | INV QTY | VOUCHER # | VOUCHER DATE |
|---|---|---|---|---|---|---|---|
| M6785407D5032 | 15 | 3244 | ADDT001 | 9/25/2012 | 1 | E4106 | 10/19/2012 |
| M6785407D5032 | 15 | 3244 | ADDT002 | 9/25/2012 | 1 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3244 | ADDT003 | 9/25/2012 | 2 | E3403 | 10/17/2012 |

| M6785407D5032 | 15 | 3244 | ADDT004 | 9/25/2012 | 1 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3244 | ADDT005 | 9/25/2012 | 2 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3244 | ADDT006 | 9/25/2012 | 2 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3244 | ADDT007 | 9/25/2012 | 1 | E3781 | 10/18/2012 |
| M6785407D5032 | 15 | 3244 | ADDT015 | 9/25/2012 | 4 | E3781 | 10/18/2012 |

| CONTRACT | DELIVERY ORDER | CLIN | INVOICE # | INVOICE REC DATE | INV QTY | VOUCHER # | VOUCHER DATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| M6785407D5032 | 15 | 3245 | ADDT008 | 9/25/2012 | 1 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3245 | ADDT009 | 9/25/2012 | 6 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3245 | ADDT010 | 9/25/2012 | 2 | E3781 | 10/18/2012 |
| M6785407D5032 | 15 | 3245 | ADDT011 | 9/25/2012 | 1 | E3781 | 10/18/2012 |
| M6785407D5032 | 15 | 3245 | ADDT012 | 9/25/2012 | 9 | E3781 | 10/18/2012 |
| M6785407D5032 | 15 | 3245 | ADDT013 | 9/25/2012 | 8 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3245 | ADDT014 | 9/25/2012 | 8 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3245 | ADDT016 | 9/25/2012 | 33 | E3403 | 10/17/2012 |
| M6785407D5032 | 15 | 3245 | ADDT017 | 9/25/2012 | 20 | E4106 | 10/19/2012 |
| M6785407D5032 | 15 | 3245 | ADDT018 | 9/25/2012 | 3 | E3403 | 10/17/2012 |

| CONTRACT | DELIVERY ORDER | CLIN | INVOICE # | INVOICE REC DATE | INV QTY | VOUCHER # | VOUCHER DATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| M6785407D5032 | 16 | 3209 | ECP0001 | 1/20/2011 | 5 | E5830 | 02/17/2011 |
| M6785407D5032 | 16 | 3209 | ECP0002 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0003 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0004 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0005 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0006 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0007 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0008 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0009 | 1/21/2011 | 1 | E7038 | 2/23/2011 |
| M6785407D5032 | 16 | 3209 | ECP0010 | 1/21/2011 | 1 | E7038 | 2/23/2011 |

| CONTRACT | DELIVERY ORDER | CLIN | INVOICE # | INVOICE REC DATE | INV QTY | VOUCHER # | VOUCHER DATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| M6785407D5032 | 19 | 4209 | REX0001 | 8/25/2011 | 1 | E0745 | 10/5/2011 |
| M6785407D5032 | 19 | 4209 | REX0002 | 8/25/2011 | 1 | E0745 | 10/5/2011 |
| M6785407D5032 | 19 | 4209 | REX0003 | 8/25/2011 | 1 | E0745 | 10/5/2011 |
| M6785407D5032 | 19 | 4209 | REX0004 | 8/25/2011 | 1 | E5096 | 10/24/2011 |
| M6785407D5032 | 19 | 4209 | REX0005 | 8/25/2011 | 1 | E0745 | 10/5/2011 |
| M6785407D5032 | 19 | 4209 | REX0006 | 8/25/2011 | 1 | E0745 | 10/5/2011 |
| M6785407D5032 | 19 | 4209 | REX0007 | 8/25/2011 | 1 | E0745 | 10/5/2011 |
| M6785407D5032 | 19 | 4209 | REX0008 | 8/25/2011 | 1 | E0745 | 10/5/2011 |

| M6785407D5032 | 19 | 4209 | REX0009 | 8/25/2011 | 1 | E0745 | 10/5/2011 |
| M6785407D5032 | 19 | 4209 | REX0010 | 8/25/2011 | 1 | E0745 | 10/5/2011 |

| CONTRACT | DELIVERY ORDER | CLIN | INVOICE # | INVOICE REC DATE | INV QTY | VOUCHER # | VOUCHER DATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| M6785407D5032 | 20 | 4432 | DXM0001 | 8/1/2012 | 2 | E0651 | 8/7/2012 |
| M6785407D5032 | 20 | 4432 | DXM0002 | 8/1/2012 | 2 | E0651 | 8/7/2012 |
| M6785407D5032 | 20 | 4432 | DXM0003 | 8/1/2012 | 2 | E0651 | 8/7/2012 |
| M6785407D5032 | 20 | 4432 | DXM0011 | 8/24/2012 | 2 | E6463 | 8/31/2012 |
| M6785407D5032 | 20 | 4432 | DXM0012 | 8/24/2012 | 2 | E6463 | 8/31/2012 |
| M6785407D5032 | 20 | 4432 | DXM0013 | 8/24/2012 | 2 | E6463 | 8/31/2012 |
| M6785407D5032 | 20 | 4432 | DXM0014 | 8/24/2012 | 2 | E6463 | 8/31/2012 |
| M6785407D5032 | 20 | 4432 | DXM0015 | 8/24/2012 | 2 | E6463 | 8/31/2012 |
| M6785407D5032 | 20 | 4432 | DXM0016 | 8/24/2012 | 2 | E6463 | 8/31/2012 |

56.    In total, Navistar sold 3,803 ISS units to USMC at inflated prices over the life of the Contract.

57.    As a result of Navistar's knowing use of false or fraudulent CPLs as proof of actual sales of similar parts at a particular price for the 11 similar ISS parts, Navistar fraudulently induced the United States to agree to inflated prices for the ISS.

58.    Navistar submitted or caused to be submitted to the United States invoices for the sale of the ISS after Navistar at the inflated prices it negotiated based on false or fraudulent documents it provided to the CO to support its prices.

59.    Navistar acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of its statements and claims for payment.

60.    The CO relied upon Navistar's false statements, representations and certifications when he agreed upon the price proposed by Navistar for the 11 ISS parts and entered into the ISS Contract Mod. No. 2 and issued Delivery Order 13 on

behalf of the USMC on March 18, 2010, and Delivery Orders 14 – 20 thereafter.

61.     A reasonable person in the position of the CO would have attached importance to Navistar's submission of the false CPLs in determining the price reasonableness of Navistar's proposed prices.

62.     Navistar knew that the false representations of the CPLs as proof of actual prior sales of similar parts was material to the CO's decision to accept Navistar's prices for the 11 ISS parts, and that the CO would not have accepted its proposed prices without prior sales data.

**COUNT I**
**False Claims Act: Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

63.     The United States re-alleges and incorporates by reference herein the allegations set forth in all of the preceding paragraphs.

64.     Defendant Navistar knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

65.     The United States paid the false or fraudulent claims because of Navistar's acts, and incurred damages as a result in an amount to be proven at trial.

66.     Navistar is liable to the United States for three times the amount of all damages sustained by the United States because of Navistar's conduct, plus a civil penalty for each violation of the Act.

<u>COUNT II</u>
**False Claims Act: Making or Using False Record or Statement**
**31 U.S.C. § 3729 (a)(1)(B)**

67.     The United States re-alleges and incorporates by references the allegations set forth in all of the preceding paragraphs.

68.     Defendant Navistar knowingly made, used, or caused to be made or used, false records, statements, or certifications material to the United States' decision to enter into the ISS modification contract at the prices proposed.

69.     Defendant Navistar knowingly made or used false or fraudulent claims for payment that were submitted to, and paid by the United States.

70.     The United States paid the false or fraudulent claims because of Navistar's acts, and incurred damages as a result in an amount to be proven at trial.

71.     Navistar is liable to the United States for three times the amount of all damages sustained by the United States because of Navistar's conduct, plus a civil penalty for each violation of the Act.

## COUNT III
### Payment by Mistake of Fact

72.    The United States re-alleges and incorporates herein by reference the allegations set forth in all of the preceding paragraphs.

73.    This is a claim for recovery of monies paid by the United States to Defendant by mistake.

74.    As a result of Defendant Navistar's conduct, the United States made payments to Navistar under the mistaken belief that the false CPLs Navistar presented to USMC reflected actual sales demonstrating that Navistar's proposed prices for the ISS parts were fair and reasonable.

75.    Navistar is liable to the United States for the amounts paid to Navistar by the United States by mistake in an amount to be determined at trial.

## COUNT IV
### Unjust Enrichment

76.    The United States re-alleges and incorporates by reference the allegations set forth in all of the preceding paragraphs.

77.    This is a claim for the recovery of monies by which the Defendant Navistar has been unjustly enriched.

78.    As described above, Navistar received, and/or continued to maintain control over, federal monies to which it was not entitled.

79.    By receiving payments from USMC for inflated prices on invoices submitted pursuant to Contract Mod. No. 2, and Deliver Orders 13-16 and 19-20, by making and using false records and statements, and by fraudulently inducing

USMC to purchase the ISS at inflated prices, Navistar has been unjustly enriched and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

### COUNT V
**Common Law Fraud**

84.     Plaintiff United States re-alleges and incorporates by reference the allegations set forth in all of the preceding paragraphs.

85.     In committing the foregoing acts, Navistar acted with fraud, oppression, and malice to present (a) false representations (b) in reference to material fact (c) made with knowledge of its falsity (d) and with the intent to deceive (e) with action taken in reliance upon the representation.

86.     As a proximate result of the aforesaid false representations and the facts herein alleged, the United States has sustained damages.

### PRAYER FOR RELIEF

WHEREFORE, the United States demands judgment against the Defendant Navistar as follows:

a.      On Plaintiff's Counts I and II against the Defendant Navistar, for treble the amount of the United States' single damages to be proven at trial, plus civil penalties allowable by law for each violation, plus such other relief as the jury deems appropriate and just;

b.      On Plaintiff's Count III, Payment by Mistake of Fact, against Defendant Navistar, for the amounts paid to Navistar by mistake in an amount to be determined, together with costs and interest;

c.      On Plaintiff's Count IV, Unjust Enrichment, against Defendant Navistar, for the amount by which Navistar has been unjustly enriched in an amount to be determined, together with costs and interest;

d.      On Plaintiff's Count V, Common Law Fraud, for damages in an amount to be determined, together with punitive damages, costs and interest;

e.      And for all other and further relief as the Court may deem just and equitable.

Plaintiff United States requests a jury trial on Counts I and II of this Complaint in Partial Intervention.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JESSIE K. LIU
D.C. Bar # 472845
United States Attorney

DANIEL F. VAN HORN
D.C. Bar # 924092
Chief, Civil Division

DARRELL C. VALDEZ
D.C. Bar # 420232
Assistant United States Attorney
555 4th Street, NW, Civil Division
Washington, DC 20530
(202) 252-2507

ANDY J. MAO
ROBERT J. McAULIFFE
GARY NEWKIRK
United States Department of Justice
Civil Division
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
(202) 307-0386